Alan C. SUGARMAN, Appellant,

v.

AEROMEXICO, INC., Appellee.

No. 79–2085.

United States Court of Appeals,
Third Circuit.

Argued March 21, 1980.

Decided June 30, 1980.

Alan C. Sugarman, pro se; Kathleen R. Wall, Asbury Park, N. J., on brief.

Donald Horowitz, Cummins, Dunn, Horowitz & Pashman, Hackensack, N. J., for appellee; John B. Newman, Hackensack, N. J., on brief.

Before ALDISERT and GIBBONS, Circuit Judges, and POLLAK, District Judge.*

LOUIS H. POLLAK, District Judge.

The question posed by this appeal is whether Aeromexico, Inc.—the national airline of Mexico, and a common carrier of passengers between Mexico and the United States—is shielded by the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602 *et seq.*, from responding in a court in the United States to claims of the sort here pressed against Aeromexico by a United States citizen. The essence of Alan Sugarman's claim against Aeromexico is that, in the last twenty-four hours of a trip to Mexico and return, he suffered manifold hardships—injurious to his serenity, health and pocketbook—by reason of an extended, unanticipated, and unexplained delay at the Acapulco airport before the departure of his Aeromexico flight back home.

Assuming proper service and venue,[1] such a claim would fall within the subject matter jurisdiction of most *nisi prius* courts, state or federal, in the United States, if Aeromexico were a private enterprise.[2] The

---

* Hon. Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. See note 9 *infra.*

2. Very likely such a claim could also be entertained in many Mexican courts. Whether tried

in a Mexican court or a court in the United States, such a claim would be tried subject to substantive rules of decision—drawn from the law of Mexico, or from the law of one or another state of the United States, or from "federal" United States law, or from some admixture thereof—the selection of which, pursuant to conventional choice-of-law doctrines,

critical question in this case is whether Aeromexico's public status precludes a court in the United States—in this instance a federal district court—from exercising the subject matter jurisdiction it would possess if Aeromexico were not a national airline.

## I.

The question arises in the following way:

In November of 1978, plaintiff Sugarman filed a complaint in a federal district court in New Jersey. As to jurisdiction, Sugarman alleged that he was a citizen of New Jersey and that Aeromexico was a New York corporation. As to the merits, Sugarman alleged that "[d]efendant entered into a [c]ontract with the [p]laintiff . . . to carry plaintiff as a passenger from Mexico to Newark, New Jersey on January 2nd 1977": that "defendant failed to exercise that degree of care [required by the contract of carriage] in that it caused the plaintiff to wait for 15 hours under extremely brutal conditions"; that "defendant . . . negligently failed to alleviate same and continually caused plaintiff to wait in the airport. . . . without any facilities or adequate food"; and that "[a]s a result of being exposed to these conditions, plaintiff suffered cardiac insufficiency, angina and arrhythmia," causing him "physical pain and mental anguish," injury to his health, and loss of "time and wages."

Aeromexico, asserting by way of affidavit that it was a Mexican corporation wholly-owned by the Mexican government, moved for summary judgment on grounds of sovereign immunity. Aeromexico pointed out (1) that 28 U.S.C. § 1604, subject to certain exceptions discussed below, lays down the general principal that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States"; and (2) that 28 U.S.C. § 1603(a), defines "foreign state" to include an "agency or instrumentality of a foreign state"; and (3) that 28 U.S.C. § 1603(b), in turn defines an "agency or instrumentality of a foreign state" to include a corporation "a majority of whose shares or other ownership interest is owned by a foreign state," (provided that the corporation is not incorporated in, and hence for diversity purposes is not a citizen of, a state of the United States). Wherefore, so Aeromexico contended, it was immune from the jurisdiction of any court in the United States.

Sugarman filed a responsive affidavit asserting that a New York-based public relations officer of Aeromexico had advised Sugarman's attorney that Aeromexico "was a Mexican corporation and . . . a New York corporation." The relevance of this affidavit was that if, in addition to being a Mexican corporation, Aeromexico had been incorporated in New York, it would have fallen outside the sovereign immunity decreed by the Foreign Sovereign Immunities Act. 28 U.S.C. §§ 1332(a) and (c), and 1603(b)(3). On the ambiguous record made by the opposing affidavits, the district court quite properly denied Aeromexico's motion for summary judgment "without prejudice." Thereafter, Aeromexico submitted a further affidavit enclosing a letter from New York's Secretary of State certifying that Aeromexico was not to be found on the roster of New York corporations.

would depend on the court's perception of the operative facts underlying the claim's component parts. In most choice-of-law contexts, by virtue of the variety of assertedly relevant operative facts and the flexibility of assertedly applicable choice-of-law doctrines, the choice-of-law question is unlikely to yield one immutable answer or group of answers which any court seized of the case would necessarily adopt. There are, however, occasional controversies in which the connections with a particular country are of such preemptive significance that a court in the United States would be obliged, as a matter of substantive due proc-

ess, to look to that country's substantive law for the rules of decision. But, since courts in the United States are competent to apply foreign law, a determination that a court in the United States would be bound as a matter of substantive due process to look to the substantive law of Mexico rather than to the substantive law of a state of the United States (see, e. g., *Home Insurance Co. v. Dick*, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 [1930]), would not mean that there was any procedural due process impediment to the exercise by a court in the United States of *in personam* jurisdiction otherwise validly attained.

With the record thus amplified, the district court once again considered Aeromexico's motion for summary judgment.

*First,* the court concluded, as it was bound to do, that Aeromexico was an "agency or instrumentality of a foreign state."

*Next,* the district court considered Sugarman's submission that, notwithstanding Aeromexico's status as an "agency or instrumentality" of the Republic of Mexico, Aeromexico was not in this instance immune from suit for the reason that Sugarman's claim against Aeromexico was embraced by at least one of the exceptions to immunity contained in 28 U.S.C. § 1605(a)(2). That section provides as follows:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

\* \* \* \* \* \*

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

Reading section 1605(a)(2) against the meager factual recitals in Sugarman's complaint, the district court concluded that none of the three clauses, had application:

Clauses one and two of § 1605(a)(2) cannot qualify as the exceptions upon which jurisdiction over Aeromexico is obtained. The action is not based on commercial activity, but rather a tortious

[*sic*] act that did not take place in the United States. The first half of clause three of § 1605(a)(2) is met, but what of the final criterion of clause three—the act must cause a direct effect in the United States.

I conclude that causing injury to American citizens abroad is simply not a direct enough effect.

Opinion of July 19, 1979 at p. 3; reproduced in *Appendix for Appellant,* p. 36a.

## II.

### A.

We agree with the district court that clauses two and three of section 1605(a)(2) afford no basis for piercing the immunity which, *prima facie,* Aeromexico derives from its sovereign parent. And, if we felt confined by the recitals in the complaint, standing alone, we would acknowledge that the complaint does not provide very sturdy underpinning for a finding that Sugarman's claim is "based upon a commercial activity carried on in the United States," as called for by the first clause of section 1605(a)(2). To be sure, the first paragraph of the complaint alleges Aeromexico operations in New York[3] which plainly constitute "commercial activity carried on in the United States,"[4] but the balance of the complaint leaves somewhat opaque the respects in which Sugarman's claim is allegedly "based upon" Aeromexico's operations in New York or any other state.

In any event, the complaint is not the only source of information which may be consulted in ruling on a motion for summary judgment. The record contains other information which tends to show a nexus between Sugarman's grievance and Aeromexico's "commercial activity carried on in the United States": The delayed flight

---

**3.** ". . . a common carrier of passengers for hire and operating the airlines system therein."

**4.** Section 1603(d) of the Foreign Sovereign Immunities Act defines "commercial activity" to mean "either a regular course of commercial conduct or a particular commercial transaction or act." The detailed section-by-section analysis of the Act prepared by the House Judiciary Committee notes that a "'regular course of commercial conduct' includes the carrying on of a commercial enterprise such as a mineral extraction company, an airline, or a state trading corporation." H.Rep.No.94–1487, 94th Cong., 2nd Sess. (1976), 5 *U.S.Code Cong. & Admin.News,* pp. 6604, 6614–15.

from Acapulco—Aeromexico's flight No. 404—was bound for New York City.[5] Flight 404 was Sugarman's "return trip"[6]—i. e., the homeward portion of a round-trip flight from the United States to Mexico and return. Moreover, Sugarman's tickets were purchased at a travel agency in Eatontown, New Jersey.[7] Accordingly, we conclude that Sugarman's claim was "based upon a commercial activity carried on [by Aeromexico] in the United States." 28 U.S.C. § 1605(a)(2) (clause 1). At a time when Aeromexico was conducting airline operations in the United States as a common carrier, Sugarman in his home state purchased Aeromexico tickets to Mexico and return. The events complained of were alleged to have transpired at the mid-point of the round-trip passage, and the claimed injury is said to have caused continuing suffering and economic loss to Sugarman after he got back home. The only way in which the first clause of 28 U.S.C. § 1605(a)(2) could be read not to comprehend Sugarman's claim against Aeromexico is to construe the phrase "in which the action is based upon a commercial activity carried on in the United States" to be a requirement that the particular misconduct complained of take place "in the United States." But so limiting a construction is belied by the very next clause, which excepts from immunity an action "based . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." When Congress intended to limit the acts subjected to liability to acts carried out (or, as in the third clause, having direct effects) in the United States, the statute makes that limitation clear. It is a limitation that would

be expected—perhaps even required by due process considerations—when, as in the situations addressed in the second and third clauses, the underlying "commercial activity of the foreign state" takes place not in the United States but "elsewhere." Compare *Upton v. Empire of Iran*, 459 F.Supp. 264 (D.D.C.1978); *Yessenin-Volpin v. Novosti Press Agency*, 443 F.Supp. 849 (S.D.N.Y. 1978). It is a limitation not to be expected—and surely not required by due process considerations—when the acts complained of, although themselves extraterritorial, grow out of "a regular course of commercial conduct," 28 U.S.C. § 1603(d), which was "carried on in the United States." 28 U.S.C. § 1605(a)(2) (clause 1). See *Outboard Marine Corp. v. Pezetel*, 461 F.Supp. 384 (D.Del.1978).

**B.**

The construction of the Foreign Sovereign Immunities Act required by its syntax is confirmed by its legislative history. That legislative history began twenty-four years before the Act—in 1952, when the celebrated "Tate Letter" signalled a fundamental change in the official position of the United States on the venerable international law doctrine of sovereign immunity.

The Tate Letter takes its name from the official who dispatched it—Jack B. Tate, Acting Legal Adviser of the State Department. The Letter's addressee was Acting Attorney General Philip B. Perlman. The core of the letter was in the following paragraphs:

My Dear Mr. Attorney General:

The Department of State has for some time had under consideration the question

---

5. *Brief and Appendix of Defendant-Respondent Aeromexico, Inc.*, p. 3. The allegation in the complaint that the flight was bound for Newark must simply be in error.

6. *Appendix for Appellant*, p. 39a.

7. *Appendix for Appellant*, p. 19a; *Brief and Appendix of Defendant-Respondent Aeromexico, Inc.*, pp. 8–9. According to an Aeromexico affidavit, "Ticket sales to New Jersey residents are handled through travel agents." *Appendix for Appellant*, p. 6a.

Indeed, until some months after Sugarman's flight Aeromexico had an office in Newark, and that office conducted correspondence with Sugarman's attorneys about the events complained of in this litigation. *Appendix for Appellant*, pp. 38a–42a. In May of 1978, Aeromexico referred further correspondence to its Public Relations Director at 500 Fifth Avenue, New York City. *Id.* p. 40a. The Newark office had been closed by the time suit was brought.

whether the practice of the Government in granting immunity from suit to foreign governments made parties defendant in the courts of the United States without their consent should not be changed. The Department has now reached the conclusion that such immunity should no longer be granted in certain types of cases. In view of the obvious interest of your Department in this matter I should like to point out briefly some of the facts which influenced the Department's decision.

A study of the law of sovereign immunity reveals the existence of two conflicting concepts of sovereign immunity, each widely held and firmly established. According to the classical or absolute theory of sovereign immunity, a sovereign cannot, without his consent, be made a respondent in the courts of another sovereign. According to the newer or restrictive theory of sovereign immunity, the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*).

\* \* \* \* \* \*

It is thus evident that with the possible exception of the United Kingdom little support has been found except on the part of the Soviet Union and its satellites for continued full acceptance of the absolute theory of sovereign immunity. There are evidences that British authorities are aware of its deficiencies and ready for a change. The reasons which obviously motivate state trading countries in adhering to the theory with perhaps increasing rigidity are most persuasive that the United States should change its policy. Furthermore, the granting of sovereign immunity to foreign governments in the courts of the United States is most inconsistent with the action of the Government of the United States in subjecting itself to suit in these same courts in both contract and tort and with its long established policy of not claiming immunity in foreign jurisdictions for its merchant vessels. Finally, the Department feels that the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts. For these reasons it will hereafter be the Department's policy to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity.

It is realized that a shift in policy by the executive cannot control the courts but it is felt that the courts are less likely to allow a plea of sovereign immunity where the executive has declined to do so. There have been indications that at least some Justices of the Supreme Court feel that in this matter courts should follow the branch of the Government charged with responsibility for the conduct of foreign relations.[8]

The Foreign Sovereign Immunities Act was not a departure from the Tate Letter. The Act was a codification of the Letter, writing into statutory law the "principle

---

**8.** 26 *Dept. of State Bull.* 984 (1952).

On June 10, 1980, during initial floor consideration by the members of the American Law Institute of the draft revised *Restatement of the Foreign Relations Law of the United States,* Monroe Leigh, Esq.—himself a former Legal Adviser of the State Department—expressed dubiety at Reporter Louis Henkin's view that the development of United States doctrines of international law owes less to the judiciary than to the executive. Mr. Leigh suggested that no Legal Adviser's exposition of international law was as consequential as Chief Justice Marshall's discussion of sovereign immunity in *The Schooner Exchange vs. M'Faddon and Others,* 7 Cranch 116, 3 L.Ed. 287 (1812). Professor Henkin responded that the Tate Letter was a doctrinal development of comparable magnitude.

Although Mr. Tate achieved some measure of doctrinal immortality because of the letter he wrote, it may fairly be said that his larger contribution to the law came latter, after he left government service: For many years, until his untimely death, he served as Associate Dean and Professor of Law at Yale, befriending hundreds upon hundreds of law students whose subsequent careers bear the imprint of his mind and heart.

[that] the immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis)." H.Rep.No. 94–1487, 94th Cong., 2nd Sess. (1976), 5 *U.S.Code Cong. & Admin.News,* p. 6605.

A principal purpose of [codification was] to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process.

*Id.* 6606.

### III.

We hold, pursuant to the Foreign Sovereign Immunities Act, that Aeromexico is not immune from suit in the court below for the wrongs allegedly suffered by passenger Sugarman in Acapulco Airport as he was awaiting his delayed homeward flight. In so holding, we intimate no view on what jurisdiction's substantive law should serve as the rule of decision with respect to any of the issues posed by this suit.[9]

### IV.

The judgment of the District Court will be reversed.

---

**9.** The Act was "not intended to affect the substantive law of liability." H.Rep.No.94–1487, 94th Cong., 2nd Sess. (1976) 5 *U.S.Code Cong. & Admin.News.* And see note 2, *supra.* We also intimate no view with respect to Aeromexico's challenge to the venue of the court below, (see *Brief and Appendix of Defendant-Respondent Aeromexico, Inc.,* p. 12)—an issue which that court can consider on remand. We regard as frivolous Aeromexico's further contention (*ibid.*) that, because 28 U.S.C. § 1330(a) contemplates that a civil action against a "foreign state" not barred by sovereign immunity shall be "nonjury," Sugarman's demand for a jury trial served to deprive the district court of jurisdiction.