**Kosutic VELIDOR, Palihnic Roko, Dozic Dragan, Popic Ante, Raganovic Zarko, Mohoric Darko, Sosic Momir, Brkanovic Roko, Krsul Nevenko, Bobic Jure and Jurcevic Rudolf**

v.

**L/P/G BENGHAZI, Her Engines, Boilers, Tackle, Appurtenances, etc. and Compagnie Algero-Libyenne De Transport Maritime.**

Appeal of LA COMPAGNIE ALGERO-LIBYENNE DE TRANSPORT MARITIME.

No. 80–2496.

United States Court of Appeals, Third Circuit.

Argued March 24, 1981.

Decided June 30, 1981.

---

Avram G. Adler (Argued), Adler, Barish, Levin & Creskoff, Philadelphia, Pa., for appellees.

Raul Betancourt, Alfred E. Yudes, Jr., (Argued), Palmer, Biezup & Henderson, Philadelphia, Pa., for appellant.

Before ADAMS and GARTH, Circuit Judges, and DUMBAULD, District Judge.*

OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal presents two questions, certified for interlocutory resolution under 28 U.S.C. § 1292(b), which require us to accommodate the procedures fashioned by admiralty law for the protection of seamen with the modern format for prosecuting claims against foreign states set forth in the Foreign Sovereign Immunities Act of 1976 (FSIA).[1] We must also reconcile some apparent tensions between two of the FSIA provisions that govern subject matter and personal jurisdiction over foreign sovereign entities. This tension comes about because seamen who wish to press a wage claim against the owner of the vessel upon which they were employed failed to comply with the FSIA section controlling maritime liens. 28 U.S.C. § 1605(b). Nevertheless, the seamen seek to base jurisdiction on the more general long-arm aspect of the Act, which rests jurisdiction on commercial activity affecting the United States. 28 U.S.C. § 1605(a)(2). We agree with the district court that it has in personam jurisdiction over the shipowner by virtue of the owner's commercial activity in this country, 28 U.S.C. § 1605(a)(2). In addition, we resolve the second question on appeal, dealing with the propriety of service of process on the defendant, in accordance with the district court's decision.

## I.

The plaintiffs are Yugoslavian seamen who worked aboard the L/P/G Benghazi, a vessel flying the flag of Algeria. The Benghazi is owned by defendant-appellant Compagnie Algero-Libyenne De Transport Maritime (CALTRAM), an instrumentality of the governments of Algeria and Libya.

During a voyage in early 1980, from England to the United States, the seamen became dissatisfied with the provisions for paying their wages and traveling expenses. CALTRAM allegedly had never repaid the seamen the expenses they incurred in traveling to join the vessel, nor their wages since the voyage started. On March 3, 1980, while on the high seas, the seamen radioed CALTRAM and requested that advance wage payments be made upon the ship's arrival in Camden, New Jersey. CALTRAM responded that it would make deposits to plaintiffs' Yugoslavian banks, as specified in the employment contracts. Then, on March 8, 1980, the crew members advised CALTRAM that they wished to be relieved of duty, and paid all wages due in cash, when the ship docked at the New Jersey port.

The Benghazi reached Camden on March 11, 1980. The crew members immediately demanded that the ship's master pay them the portion of outstanding wages to which they were entitled under the Seaman's Wage Act, 46 U.S.C. §§ 596–597. When no wages were forthcoming, on March 14 the seamen instituted a complaint in admiralty against CALTRAM and the vessel in the United States District Court for the District of New Jersey. The complaint alleged breach of the employment contracts as well as violations of the Seaman's Wage Act. The plaintiffs requested that the vessel be seized to prevent it from leaving the port. The district court granted this request, and on March 14, 1980, ordered the Benghazi arrested. In admiralty law, arrest is the traditional device to secure in rem jurisdiction over a ship.

The next business day, CALTRAM appeared before the district court and moved to vacate the arrest on the ground that it was an instrumentality of the Algerian government. The FSIA renders ships owned by foreign governments immune from arrest, and any arrest must be lifted immediately upon ascertaining the sovereign ownership of a vessel. 28 U.S.C.

---

*Honorable Edward Dumbauld, Senior United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. Pub.L. 94–583, 90 Stat. 2891, *codified* at 28 U.S.C. §§ 1330, 1332(a)(2)–(a)(4); 1391(f); 1441(d); and 1602–1611.

§§ 1605(b), 1609. To establish the Benghazi's immunity, CALTRAM submitted a deposition from a consular official of the Algerian Embassy certifying that the shipping company was the sole owner of the Benghazi, and that it was an entity of the Algerian government, incorporated under the laws of Algeria, and operated by the state. The Deputy Chief of Protocol and the Secretary of State supported this deposition with documents which verified that the consular official was registered to speak on behalf of Algeria. When met with this proof, the district court held that CALTRAM had established its status as an instrumentality of Algeria entitled to the protections of the FSIA.[2] Consequently, on March 17, 1980, the court lifted the order of arrest on the Benghazi.

At the same hearing, however, after considering plaintiffs' contentions that they were unaware of CALTRAM's association with the Algerian government,[3] the district court ruled that, despite the arrest, it had in personam jurisdiction over CALTRAM by virtue of § 1605(b), the admiralty provision of the Immunities Act.[4]

Section 1605(b) is designed to avoid the arrest of vessels owned by foreign sovereigns, since such seizures frequently touch sensitive diplomatic nerves. H.R.Rep.1487, 94th Cong., 2d Sess. 21–22 (1976), reprinted in 1976 U.S.Code Cong. & Ad.News 6604, 6620–21. This section renders arrest unnecessary by extending to plaintiffs an in personam remedy, limited to the value of the vessel or cargo. In furtherance of the objective to prevent arrests, § 1605(b) provides that a party who initiates the seizure

2. Plaintiffs contend that CALTRAM failed to carry its burden of proving that it is within the scope of the FSIA. Although the question of CALTRAM's status has not been certified for this interlocutory appeal, it is a matter inextricably linked to the issue whether in personam jurisdiction over CALTRAM exists under the FSIA. The same type and quantum of proof offered by CALTRAM was found sufficient to establish the applicability of the FSIA in Jet Line Services, Inc. v. M/V Marsa El Hariga, 462 F.Supp. 1165 (D.Md.1978). Accordingly, the district court did not err in holding that CALTRAM had demonstrated its status as an instrumentality of a foreign sovereign under § 1603(b) of the Act.

3. Plaintiffs testified that they were misled because other vessels in the CALTRAM fleet flew the flag of Libya, and because the Lloyds Register of Shipowners did not reveal the link between the Benghazi's owner and the government of Algeria. In fact, the Lloyds Register indicated that another shipping company, Compagnie Nationale Algerienne de Navigation, was the national entity. See H.R.Rep.No.1487, 94th Cong.2d Sess. 21–22 (1976), reprinted in [1976] U.S.Code Cong. & Ad.News 6604, 6620–21 (evidence that a party has relied on a standard registry of ships, which did not reveal the foreign state's interest in the vessel, would be prima facie evidence of a party's lack of awareness that the vessel of a foreign state was involved).

4. 28 U.S.C. § 1605(b) provides:
    (b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: Provided, That—
    (1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; but such notice shall not be deemed to have been delivered, nor may it thereafter be delivered, if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit— unless the party was unaware that the vessel or cargo of a foreign state was involved, in which event the service of process of arrest shall be deemed to constitute valid delivery of such notice; and
    (2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in subsection (b)(1) of this section or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.
    Whenever notice is delivered under subsection (b)(1) of this section, the maritime lien shall thereafter be deemed to be an in personam claim against the foreign state which at that time owns the vessel or cargo involved; Provided, That a court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose, such value to be determined as of the time notice is served under subsection (b)(1) of this section.

of a foreign sovereign's vessel will lose the right to proceed in personam, unless the party is unaware of the shipowner's identity.

On April 3, 1980, CALTRAM moved the court to vacate the order of March 17 insofar as it found personal jurisdiction under § 1605(b), and to dismiss the complaint, on the ground that the plaintiffs had not fulfilled the requirements for proper service of process set forth in § 1605(b).[5] Plaintiffs delivered a copy of the complaint only to the master of Benghazi. Section 1605(b)(2), however, provides that service on the master is not sufficient, and conditions the right to convert an in rem admiralty claim into an in personam action upon compliance with § 1608(b) within ten days of serving the master. The notice provision of § 1608(b) relevant to this case requires delivery of a copy of the summons and complaint to an officer, managing, or general agent of the instrumentality of the foreign sovereign. 28 U.S.C. § 1608(b)(2).

At the hearing to consider the motion to dismiss, the crewmen admitted that they had failed to comply with § 1605(b)(2), because they had never served a copy of the complaint on anyone other than the ship's master. They argued, however, that this failure did not warrant dismissal of the entire complaint, because they had originally asserted in personam claims against CALTRAM in addition to the in rem maritime lien levied against the Benghazi. Section 1605(b) governs only the latter claim, they contended. Jurisdiction over CAL-

TRAM for purposes of the in personam claims could be obtained under the general long-arm provisions of the FSIA set forth in § 1605(a)(2). Thus, the seamen asserted, they should not be penalized for failure to satisfy the alternative jurisdictional basis of the maritime lien standards in § 1605(b).

The district judge found this argument persuasive, and issued an order denying the motion to dismiss and declaring in personam jurisdiction to exist on the basis of § 1605(a)(2). In addition, he found that service of process on the master satisfied § 1608 insofar as that section applies to § 1605(a)(2) actions. Recognizing that the issues raised by the interplay between § 1605(b), § 1605(a)(2), and § 1608 were novel and controlled the course of the litigation, the district judge certified his ruling for immediate appeal under 28 U.S.C. § 1292(b). Specifically, we must resolve whether (1) the district court has in personam jurisdiction over CALTRAM under § 1605(a)(2) of the FSIA, and (2) if so, whether service of process on the ship's master is sufficient to fulfill the requirements of § 1608(b) for serving the instrumentality of a foreign sovereign.

## II.

To place the questions before us in clearer perspective, it is necessary to survey the statutes that bear on this case.

### A. *The Foreign Sovereign Immunities Act*

Enacted in 1976, the objective of this Act is to facilitate the bringing of suits against

---

**5.** 28 U.S.C. § 1608(b) provides:

(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C) as directed by order of the court consistent with the law of the place where service is to be made.

foreign governments, arising out of commercial activity, in United States courts. In addition, the FSIA is designed to provide a uniform statutory procedure for establishing subject matter and personal jurisdiction over foreign sovereign entities, so that the seizure of property situated in this country is no longer necessary to secure jurisdiction. *See* H.R.Rep.No.94–1487, *supra* at 7–8; [1976] U.S.Code Cong. & Ad.News at 6605.

The overriding congressional purpose behind the FSIA was to codify the principle of international law known as "restrictive" sovereign immunity. *Id.* Adopted officially by the Department of State in 1952,[6] this principle "restricts" the situations in which foreign states may claim immunity from judicial action to those concerning public, or sovereign acts (*jure imperii*). Immunity is not extended, under this doctrine, to suits based on commercial, or private acts (*jure gestionis*). Consequently, the presence of commercial activity is the crucial component of the FSIA sections detailing when a foreign sovereign may not invoke immunity. *See* 28 U.S.C. §§ 1603(d), 1605(a).[7]

Under the analytic structure of the Act, the existence of subject matter and personal jurisdiction, the requisites for service of process, and the availability of sovereign immunity as a defense are intricately coordinated inquiries. The fundamental jurisdiction-conferring section, 28 U.S.C. § 1330(a), gives United States district courts subject matter jurisdiction over claims against foreign sovereigns for which the state is not entitled to immunity under §§ 1605–07. Personal jurisdiction over the sovereign exists when the minimum contacts and requirements for service set forth in §§ 1605–08 are satisfied. To summarize this scheme, subject matter jurisdiction plus service equals personal jurisdiction, and personal jurisdiction coupled with proper service defeats a claim of immunity. *See Texas Trading & Milling Corp. v. Federal Repub. of Nigeria*, 647 F.2d 300, 307–08 (2d Cir. 1981); *Libyan-American Oil Co. v. Socialist People's Libyan Arab Jamahirya*, 482 F.Supp. 1175, 1177 (D.D.C.1980).

The basic long-arm provision for obtaining personal jurisdiction, 28 U.S.C. § 1605(a), is phrased in terms of exceptions to the principle of immunity:

> § 1605. General exceptions to the jurisdictional immunity of a foreign state.
>
> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> .    .    .    .    .
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

Although § 1605(b) is specifically tailored to admiralty suits brought to enforce maritime liens, the legislative history reveals that § 1605(b) is not the exclusive vehicle for bringing cases concerning shipping. The House Report accompanying the FSIA

---

**6.** The doctrine was articulated in the Tate Letter, drafted by the then-Acting Legal Adviser to the Department of State, Jack B. Tate. 26 Dept. of State Bulletin 984 (1952).

**7.** Section 1603(d) provides:

(d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

Congress deliberately left the distinction between commercial and governmental activities open for judicial adumbration on a case-by-case basis. *See* H.R.Rep.No.94–1487, *supra*, at 16. The legislative history indicates that if the activity is one in which a private entity could engage, it is not entitled to immunity, even if the contract seeks to procure goods for a governmental purpose. *See Texas Trading & Milling Corp. v. Fed'l Repub. of Nigeria*, 647 F.2d 300, 308–09 (2d Cir. 1981).

declares that § 1605(b) would not preclude a suit in accordance with other provisions, such as § 1605(a)(2). H.R.Rep.No.94–1487, *supra*, at 22; [1976] U.S.Code Cong. & Ad. News at 6621.

The non-exclusive scope of § 1605(b) is consistent with well-settled admiralty procedures. Seamen wishing to assert claims for wages have always had the option of proceeding in rem against the vessel, or in personam against the owner or the ship's master.[8] The in rem action imposes a maritime lien against the vessel, which sets a ceiling on potential liability and assures a fund to satisfy any recovery. Section 1605(b) is addressed to the maritime lien situation, whereas § 1605(a)(2) would appear to be the appropriate vehicle for measuring the existence of jurisdiction in an admiralty action that pursues the in personam route from the outset.

### B. *The Seaman's Wage Act*

Although the Foreign Sovereign Immunities Act exclusively controls the jurisdiction of the district court,[9] it does not provide a cause of action or dictate substantive rules of liability. H.R.Rep.No.94–1487, *supra*, at 11; *Sugarman v. Aeromexico, Inc.*, 626 F.2d 270, 275 (3d Cir. 1980). The plaintiffs base their cause of action on the Seaman's Wage Act, 46 U.S.C. §§ 596–97; consequently we must examine the substantive policies underlying that Act.

This statute, derived from legislation dating back to 1790,[10] is broadly designed to safeguard seamen, the historical wards of admiralty. Section 596 provides that the master or owner of a vessel making a foreign voyage shall pay the crew one-third of wages due within twenty-four hours after cargo is discharged. Its companion provision, § 597, states that seamen shall be entitled to receive on demand from the master one-half of the balance of wages due at each port in which the vessel loads or delivers cargo. This right specifically applies "to seamen on foreign vessels while in the harbors of the United States, and the courts of the United States shall be open to such seamen for its enforcement."[11] Courts have construed this extension of rights to foreign seamen to apply under § 596, as well. *See, e. g., Mavromatis v. United Greek Shipowners' Corp.*, 179 F.2d 310 (1st Cir. 1950).

The purpose of the Seaman's Wage Act is "to protect from overreaching a generally impecunious class", and to insure that foreigners "will not be turned ashore without funds," so that "they become a public charge on the harbor." *Strathearn S.S. Co. v. Dillon*, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607 (1920); *Mavromatis, supra*. The

**8.** *See, e.g., Everett v. U. S.*, 277 F. 256 (D.Wis.), *aff'd*, 284 F. 203 (9th Cir.), *cert. denied*, 261 U.S. 615, 43 S.Ct. 361, 67 L.Ed. 828 (1921); *The Acorn*, 32 F. 638 (D.Pa.1887).

**9.** *See Ruggiero v. Compania Peruana De Vapores*, 639 F.2d 872 (2d Cir. 1981) (Longshoremen and Harbor Worker's Compensation Act case; court holds that 28 U.S.C. § 1330 is exclusive, so that plaintiffs cannot invoke procedures available when jurisdiction can be founded on 28 U.S.C. § 1332).

**10.** Act of July 20, 1790, c. 29, § 6, 1 Stat. 133; R.S. § 4529.

**11.** The constitutionality of extending the Seaman's Act to foreign ships and foreign seamen was settled in *Strathearn S.S. Co. v. Dillon*, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607 (1920), and its companion case. *The Westmeath*, 252 U.S. 358, 40 S.Ct. 353, 64 L.Ed. 612 (1920), *aff'g*, 258 F. 446 (2d Cir. 1919). In *Strathearn* a British subject shipped on a British vessel under a contract executed in Britain that called for all wages to be paid at the end of the three year voyage. While the ship was docked in Florida, the seaman demanded one-half of his wages, under § 597 of the Seaman's Act. The shipowner argued that the application of this statute to foreign seamen constituted an unconstitutional destruction of contract rights. Relying on *Patterson v. The Bark Eudora*, 190 U.S. 169, 23 S.Ct. 821, 47 L.Ed. 1002 (1903), which had rejected this argument, the Supreme Court held that Congress had authority to pass § 597 by virtue of its constitutional jurisdiction over foreign merchant vessels in United States ports. This authority entitled Congress to set the terms and conditions under which foreign vessels may enter United States harbors and bring foreign seamen into United States ports. In return for the privilege of conducting maritime business in United States ports, foreign shipowners are obliged to compensate seamen according to United States laws, contract provisions to the contrary notwithstanding.

protective mantle of the Act is not confined to foreign seamen, however; it also guards the interests of American seamen by equalizing the cost of operating United States and foreign flag vessels. American shipowners are thereby discouraged from placing their vessels under foreign flags, and foreign owners have no special incentive to avoid hiring United States citizens as crewmembers. *See Montiero v. Sociedad Maritima San Nicolas, S.A.,* 280 F.2d 568 (2d Cir. 1960).

To effectuate the protective thrust of the Seaman's Act, courts must construe it liberally in favor of its beneficiaries. *Forster v. Oro Navigation Co.,* 228 F.2d 319 (2d Cir. 1955); *Johnson v. Isbrandtsen Co.,* 190 F.2d 991 (3d Cir.), *aff'd,* 343 U.S. 779, 72 S.Ct. 1011, 96 L.Ed. 1294 (1951). A final principle worthy of note is that the purposes of the Act can best be achieved by giving foreign seamen unobstructed, mandatory access to the federal courts. *Montiero, supra,* 280 F.2d at 573.

### III.

Our task is now to harmonize the principles of the FSIA and the Seaman's Act with the circumstances of the present case.

The plaintiffs admit that they have lost their right to assert a maritime lien under § 1605(b) of the FSIA, because once they discovered the identity of CALTRAM they failed to send notice to the foreign instrumentality itself, as required by § 1605(b)(2) and § 1608(b). Plaintiffs contend, however, that this failure to comply with § 1605(b) does not warrant dismissal of the complaint. The seamen point out that the complaint asserted a prayer for an in personam judgment against CALTRAM in addition to the in rem maritime lien against the Benghazi. Inasmuch as § 1605(b) governs only the in rem claim, plaintiffs maintain, their in per-

sonam claim should be measured against the jurisdictional standards contained in § 1605(a)(2).

This rationale accords with the intent of Congress that the maritime lien procedure of § 1605(b) should not exclude admiralty suits that satisfy other sections of the FSIA. *See* H.R.Rep.No.94–1487, *supra* at 22. Consequently, notwithstanding their failure to satisfy the service requirements of § 1605(b), plaintiffs may look to the long-arm provisions of § 1605(a)(2) as a means of obtaining in personam jurisdiction over CALTRAM.

■ A case governed by § 1605(a)(2) entails the resolution of the following questions:

(1) Does the conduct upon which the action is based amount to "commercial activity?"

(2) Does that commercial activity bear the relation to the cause of action and to the United States described by one of the three components of § 1605(a)(2), warranting the exercise of subject matter jurisdiction under § 1330(a)?

(3) Has service been consistent with § 1608, which, when coupled with subject matter jurisdiction under § 1330(a), makes personal jurisdiction proper under § 1330(b)?

*See Texas Trading & Milling, supra,* at 308.[12]

In response to the initial question, CALTRAM admits that sailing a ship into a United States port and discharging and receiving cargo here constitute commercial activity. The legislative history of the FSIA lists the operation of a shipping line as an example of a commercial enterprise that, when performed by a foreign sovereign, will defeat a claim of sovereign immunity. H.R.Rep.No.94–1487, *supra,* at a [1976] U.S.Code Cong. & Ad.News at 1608.

---

12. We must also inquire whether this exercise of subject matter jurisdiction is proper under Article III, and whether the assertion of personal jurisdiction comports with the due process clause. *Texas Trading & Milling, supra,* at 308. *See also Verlinden B.W. v. Central Bank of Nigeria,* 647 F.2d 320 (2d Cir. 1981).

In the present case, the response to these inquiries appears to be self-evident. The case arises under a federal statute, 46 U.S.C. §§ 596–97, within the meaning of Article III's federal question authority, and CALTRAM routinely conducts its navigation and cargo business within the United States, thus satisfying the due process notion of "minimum contacts."

820

■ The mere pursuit of commercial activity affecting the United States does not fully satisfy § 1605(a)(2), however. It is essential that there be a nexus between the plaintiffs' grievance and the sovereign's commercial activity. *Sugarman v. Aeromexico*, 626 F.2d 270 (3d Cir. 1980). According to the component of § 1605(a)(2) relevant to this case, the "action [must be] based upon a commercial activity carried on in the United States by the foreign state."

■ CALTRAM vigorously denies that the requisite nexus exists. It maintains that this lawsuit involves merely a contract dispute governed by Algerian law, and that an alleged breach of Algerian contracts executed abroad with Yugoslavian seamen has no connection with its commercial activity in the United States. This argument, however, completely overlooks plaintiffs' cause of action under the Seaman's Wage Act.

The rights asserted by the seamen under §§ 596 and 597 came into existence solely because the Benghazi sailed into a United States port. *See, e. g., Strathearn v. Dillon, supra*. Thus, the claim for wages due under these provisions is entirely dependent upon CALTRAM's commercial activity in the United States.

The Seaman's Act claims also subsume the contract claims. Section 596 and 597 override contrary provisions in contracts, and the law of the vessel's flag has no application to alleged violations of the wage statute. *See Strathearn, supra; Samad v. the Etivebank*, 134 F.Supp. 530 (D.Va.1955). Seaman's Act claims may be interrelated with breach of contract claims, however, and they may require interpretations of foreign contracts. For example, the balance of wages due under §§ 596 and 597 will depend on the compensation set by the contract and on whether previous amounts owed have been paid in accordance with

that agreement. In Seaman's Act cases United States law is applied to the overarching claims under §§ 596 and 597, while foreign law may be applied to underlying contractual disputes. *See, e. g., Montiero, supra; Koukorinis v. S/T Eurypyle*, 214 F.Supp. 344 (D.Va.1963). Although Algerian law may govern the fundamental contract issues in the present case, this fact will not defeat the jurisdiction of a United States court. To ascertain jurisdiction under the FSIA, we must look to the nature of the plaintiff's claim and the commercial activity that generated it, rather than to the substantive law that might eventually govern some issues. *Sugarman v. Aeromexico, supra.*

We conclude, therefore, that the plaintiffs' entire case arises under the Seaman's Wage Act, and, since the Wage Act action is inextricably tied to CALTRAM's domestic commercial activity, all of plaintiffs' claims, including the contractual disputes, satisfy the jurisdictional nexus mandated by § 1605(a)(2).[13] It is immaterial that the acts constituting breach of contract may have taken place outside the United States, because under § 1605(a)(2) the alleged misconduct does not have to occur in this country if the claim arises out of a course of commercial activity here. *Sugarman v. Aeromexico, supra* (although conduct leading to an aircraft's delay, which in turn caused the damage, may have occurred in Mexico, plaintiff could assert § 1605(a)(2) jurisdiction over state-owned airline).

To complete the linkage between personal jurisdiction and subject matter jurisdiction, we must determine whether service of process conformed to § 1608(b). CALTRAM contends that service on the ship's master alone is not sufficient to perfect an admiralty claim. Plaintiffs point out, on the other hand, that the additional requirement of

13. There is an alternative argument for finding in personam jurisdiction over CALTRAM with regard to breach of contract claims. Under § 1605(a)(2), United States courts may assume jurisdiction over actions based on "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that Act causes a

direct effect in the United States." Here, the act outside the United States was the breach of employment contracts. The direct effect in the United States is that the seamen were brought to a domestic port without wages because of the alleged breach, in contravention of United States policy.

sending a summons and complaint to the foreign instrumentality relates solely to maritime lien actions under § 1605(b). Plaintiffs' interpretation is supported by the text of the statute, insofar as this requirement appears only within § 1605(b). In declaring that delivery of notice to the master does not, in and of itself, constitute complete service of process in § 1605(b) actions, Congress was concerned that masters are sometimes employed by charterers, rather than shipowners. Congress therefore imposed additional service procedures to insure that the foreign sovereign owner would always receive actual notice of in rem admiralty proceedings commenced against it. H.R.Rep.No.94–1487, *supra*, at 22; [1976] U.S.Code Cong. & Ad.News at 6621. This concern may not be applicable to an in personam admiralty claim, however, because under traditional service standards, service on the master would bind the owner only when the master is the agent of the owner.

Consequently, in this § 1605(a)(2) case the service specifications of § 1605(b) need not give us pause. We must determine only whether § 1608(b)(2), governing service on instrumentalities of foreign sovereigns, has been satisfied.

Section 1608(b)(2) provides generally that service upon instrumentalities of foreign states may be made by delivering a copy of the summons and complaint to an officer, or a managing or general agent. Plaintiffs served the master of the Benghazi; thus, the appropriate inquiry is whether the master is an "agent" of the ship's owner for the purpose of receiving process.

■ Under maritime law, a ship's master is regarded as the agent and representative of the owner. A master is entrusted with the care and management of the vessel, and he is invested with substantial authority to conduct the ship's business. As the owner's agent, the master can bind his principal for acts performed within the scope of his agency. *See* Norris, The Law of Seamen v. 1 §§ 299,522 (3d ed. 1970). Inasmuch as the master here is employed by the owner and is the owner's general agent for conducting the ship's business, he should be regarded as an "agent" for accepting process within the meaning of § 1608(b)(2).

■ CALTRAM contends, however, that the congressional intent behind § 1605(b) will be circumvented if service on the master alone is allowed to suffice for § 1605(a) actions. In actuality, our conclusion comports with the purpose of § 1608. Rather than making service on foreign instrumentalities a rigid, technical, or cumbersome procedure, Congress sought to facilitate the ability of private plaintiffs to serve foreign entities. In addition, Congress wished to insure that the sovereign owner would receive actual notice. H.R.Rep.No.94–1487, *supra*, at 23–24. In the present controversy, officers of CALTRAM immediately became aware of the suit, so service on the master fully achieved the objective of actual notice. Under these circumstances, for us to hold that the master was not CALTRAM's agent within the meaning of § 1608(b) would be to impose on plaintiffs a procedural burden at odds with the avowed congressional desire to expand the means of serving process on the instrumentalities of foreign sovereigns.

We conclude that the district court has in personam jurisdiction over CALTRAM by virtue of § 1605(a)(2) of the FSIA. In addition, service of process on the ship's master complied with § 1608(b)(2). Therefore, under the terms of the Act CALTRAM is not entitled to invoke sovereign immunity, and the district court has subject matter jurisdiction over this dispute. 28 U.S.C. § 1330(a).

This holding does not, as CALTRAM contends, nullify the congressional design for asserting admiralty claims against foreign states. To the contrary, the result we reach harmonizes the fundamental policies of both the FSIA and the Seaman's Wage Act. First, it furthers the FSIA principle of "restrictive" immunity, which mandates that foreign sovereigns should not be immune from answering for the consequences of their commercial activity. It also advances the protective policies of the Seaman's Act, especially the principle that domestic tribu-

nals should always remain open to foreign seamen seeking to vindicate their rights under the Act. Indeed, were the Court to hold that jurisdiction is lacking because plaintiffs did not follow the procedural technicalities of § 1605(b), we might be creating a ready avenue for State-owned ships to evade the obligations of the Seaman's Act. Both the FSIA and the Seaman's Act are designed to put the commercial enterprises of foreign sovereigns on equal competitive footing with domestic firms. Thus, CALTRAM should comply with the wage provisions of 46 U.S.C. §§ 596 and 597, and it should be held accountable for its domestic commercial activities in United States courts. Our holding today is consistent with each of these obligations.

### IV.

Each question certified for interlocutory appeal is answered in the affirmative: the district court has jurisdiction under the FSIA, and service of process here fulfilled the requirements of § 1608(b)(2). Accordingly, the judgment of the district court will be affirmed.