**Isabel Morel DE LETELIER, Michael Maggio, as personal representative of Orlando Letelier, Christian A. Letelier, Jose I. Letelier, Francisco J. Letelier, Juan Pablo Letelier, Michael Moffitt, individually, and as personal representative of Ronni Karpen Moffitt, Murray H. Karpen, and Hilda Karpen, Judgment Creditors,**

v.

**The REPUBLIC OF CHILE, also doing business as Linea Aerea Nacional-Chile, Judgment Debtor,**

**and**

**Linea Aerea Nacional-Chile, Garnishee-Respondent.**

No. M18–302.

United States District Court,
S.D. New York.

July 28, 1983.

---

**11.** In fact, it appears that plaintiff has filed these motions in the court of appeals as well as in this court.

**1492**

Tigar & Buffone, Washington, D.C., Donovan, Leisure, Newton & Irvine, New York City, for judgment creditors; William J.T. Brown, Joseph P. Cyr, New York City, Michael E. Tigar, John J. Privitera, Washington, D.C., of counsel.

Hale, Russell & Gray, New York City, for judgment debtor; Thomas F. Engel, New York City, Gerald D. Morgan, Jr., Washington, D.C., Carter K. Combe, Karen Gross, New York City, of counsel.

LASKER, District Judge.

The personal representatives and survivors of Orlando Letelier and Ronni Moffitt ("judgment creditors") move pursuant to Fed.R.Civ.Pr. 69 and N.Y.C.P.L.R. § 5228 for the appointment of Michael Moffitt as receiver of the property interests of the Republic of Chile in the Chilean national airline, Linea Aerea Nacional-Chile ("LAN"). The judgment against Chile was entered in the United States District Court for the District of Columbia, and has been filed in this court pursuant to the requirements of 28 U.S.C. § 1963.

The action arose from the tragic deaths of Orlando Letelier, the former Chilean ambassador to the United States, and his secretary, Ronni Moffitt. The two were killed on September 21, 1976, in Washington, D.C., when the car in which they were driving exploded as the result of the detonation of a bomb which had been placed under the driver's seat. Investigations into the murders were conducted by, among others, the Federal Bureau of Investigation ("FBI"), the Federal Aviation Administration ("FAA"), and the United States House of Representatives Subcommittee on Government Activities and Transportation.

The FBI investigation culminated in indictments against nine individuals. One, Michael Vernon Townley, a United States citizen employed by Direccion de Intelligencia Nacional ("DINA"), the Chilean intelligence agency, pled guilty to conspiracy to murder a foreign official. Three of the defendants were tried and convicted, but the convictions were reversed on appeal,[1] after which, upon retrial, the jury acquitted. The remaining five defendants could not be tried because either Chile refused to extradite them or the FBI was unable to apprehend them.

The present action, a civil suit against the Republic of Chile, Townley, and the other defendants in the criminal action, was commenced in November, 1978. The complaint alleged that the individual defendants, acting at the direction and with the assistance

---

1. The opinion of the Court of Appeals for the District of Columbia, *United States v. Sampol,* 636 F.2d 621 (D.C.Cir.1980), contains a lengthy description of the evidence adduced at trial concerning the Letelier assassination.

of the Republic of Chile, caused the deaths of Letelier and Moffitt. None of the defendants answered the complaint, and defaults were entered against them. Subsequently, the Republic of Chile sent a "diplomatic note" and a memorandum of law to the Clerk of the Court via the Department of State, urging that the court lacked jurisdiction over Chile under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* ("FSIA"). Despite what the court described as Chile's "unorthodox" means of communication with the court, the default was reopened to consider the jurisdictional arguments. After thorough analysis of the language and history of the FSIA, Chile was found amenable to jurisdiction under § 1605(a)(5) which allows the exercise of jurisdiction against foreign states "in any case . . . in which money damages are sought against a foreign state for personal injury or death . . . occurring in the United States and caused by the tortious act or omission of that foreign state." 488 F.Supp. 665, 669 (D.D.C.1980) (Green, J.).

Under § 1608(e) of the FSIA, a judgment by default may not be entered against a foreign state unless "the claimant establishes his claim or right to relief by evidence satisfactory to the court." Accordingly, after the finding of jurisdiction was made, a hearing was held to allow for the submission of evidence to establish the plaintiffs' right to relief. No appearance was made by Chile. After reviewing the evidence, particularly Townley's testimony at the criminal trial, Judge Green concluded that it satisfactorily established that

> "employees of the Republic of Chile, acting within the scope of their employment and at the direction of Chilean officials who were acting within the scope of their office, committed tortious acts of assault and battery and negligent transportation and detonation of explosives that were the proximate cause of the deaths of Orlando Letelier and Ronni Moffitt."

502 F.Supp. 259, 266 (D.D.C.1980). A default judgment was accordingly entered against Chile.

LAN, the garnishee-respondent on the present application, is a commercial airline wholly owned by the Republic of Chile. It has not been named as a defendant. No findings were made by Judge Green as to its role, if any, in the assassinations, with the exception of the observation that "[u]ncontradicted testimony demonstrated that facilities and personnel of LAN . . . were used by Townley in connection with the preparation and carrying out of the assassination." 502 F.Supp. at 262.

However, inquiry was made into LAN's role by the House of Representatives Subcommittee on Government Activities and Transportation, whose findings are contained in a report entitled "Alleged Violations of U.S. Aviation Laws and Regulations by LAN Chile Airlines," H.R.Rep. No. 1157, 96th Cong., 2d Sess. (1980) ("The Report"). The Report was based on a hearing at which the subcommittee heard testimony from the FBI, the United States Attorney's Office, the Department of State, the FAA, the Civil Aeronautics Board ("CAB"), and a representative of LAN, Fernando Cruchaga, the assistant station manager of LAN's Kennedy International Airport office at the time of the assassination. In addition, the subcommittee examined the transcripts of the criminal proceedings and the FAA and CAB's records concerning the events in question.

In the section of the Report entitled "The Relationship Between LAN Chile Airlines and the Letelier Assassination," the following points were made:

1. "[O]n numerous occasions LAN Chile Airlines was used by the assassins in ways which were illegal, and which created a serious threat to the safety and security of LAN Chile passengers and cargo." (Report at 4).

2. "In order to carry out the assassination, Townley (who was in Chile) had made arrangements to work with members of the Cuban Nationalist Movement ("CNM") in the United States. . . . Townley forwarded . . . plastic explosives and . . . TNT to the CNM via LAN." (*Id.*)

3. "[T]he CNM sent Townley ... paging devices which he modified to serve as remote control detonation for explosives which he later shipped back to the CNM. The paging devices were shipped to and from Chile via LAN ..." (*Id.*).

4. Townley flew to the United States via LAN on September 8, 1976, on a ticket issued under an alias, carrying "a substance which the FBI believes was lead trinitroresorcinate, a highly volatile, unstable, primary explosive, and several flash caps (used to ignite explosives)." (Report at 5).

5. Townley met with other DINA agents and a LAN employee on September 9, 1976, in the LAN VIP lounge, and "arranged ... to rent a car for them in New York under a false name." (*Id.*).

6. After placing the explosives in Letelier's car, Townley was unable to return to Chile under the alias by which he entered the country, so he "approached a LAN Chile pilot, Ronald Berger, who used his internal account to arrange for the issuance of a new ticket under ... another of Townley's fictitious identities." (*Id.*).

7. "LAN Chile personnel participated in a number of currency transactions that were undertaken in order to pay off various participants in the assassination scheme." (*Id.*)

Additional information concerning Townley's use of LAN in connection with the assassination is contained in the testimony of Townley at the criminal trial (Exhibit A to Affidavit of John Privitera in support of the motion), the testimony of Fernando Cruchaga, LAN's former assistant manager at the Kennedy International Airport facility, before the grand jury which indicted Townley and others (Exhibit B to Privitera Affidavit), and an interim FBI report on LAN's role in the assassination, dated January 25, 1980 (Exhibit C to Privitera Affidavit).

## I.

Before delving into the parties' arguments, it is appropriate to review the present posture of the case. First, the current application is an attempt to execute on a judgment. Chile litigated the question of the trial court's jurisdiction; its arguments were rejected. It was given an opportunity to litigate the merits, but chose to default. No appeal has been taken from Judge Green's decisions.

Second, and of equal importance, the defendant in this action is the Republic of Chile, not LAN. LAN was never served with process in this action, and had no opportunity to offer evidence or cross-examine witnesses before Judge Green. Although LAN's activities and personnel have been the subjects of Congressional and FBI investigations, no findings against LAN have been made by a court of law in connection with the events out of which this action arose.

LAN argues that it is a separate juridical entity from the Republic of Chile and not liable for the Republic's debts. It asserts that the judgment creditors have made no showing which would warrant piercing the corporate veil between LAN and the Republic; and that the evidence proffered linking LAN to the assassinations is hearsay, lacking in trustworthiness, and even if credited, of little probative value. Moreover, LAN argues that even if it could be deemed liable on Chile's debt, the FSIA bars execution on LAN's assets. Finally, LAN contends that execution on LAN's assets to satisfy a judgment against Chile would violate LAN's right to due process of law, because LAN was not a party to the action in which liability was found.

The judgment creditors respond that LAN, as a wholly-owned subsidiary of Chile, is simply an asset of the Republic, and that, as judgment creditors of the Republic, they can levy on any of the Republic's assets. In the alternative, the judgment creditors assert that they are entitled to pierce the corporate veil and reach LAN's assets because the evidence produced reveals that, in carrying out the assassinations, Chile disregarded LAN's separate status and treated

it as an alter ego. With respect to the FSIA, the judgment creditors contend that Chile's interest in LAN is leviable under § 1610(a)(2) which permits execution upon "property . . . used for the commercial activity upon which the claim is based." Finally, the judgment creditors argue that LAN's due process rights are not violated by execution upon Chile's interest in LAN: Chile may, should it choose to do so, use LAN's assets to satisfy a Chilean debt, so LAN cannot complain if Chile is forced to use those assets for the same purpose.

## II.

The question whether a foreign juridical entity may be held accountable for the acts and liabilities of its sovereign parent has been the subject of a recent ruling by the United States Supreme Court in *First National City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec")*, —— U.S. ——, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). The *Bancec* decision is of profound importance to the difficult questions presented here, and bears close analysis.

The *Bancec* action arose from the issuance of an irrevocable letter of credit by First National City Bank ("Citibank") in favor of Bancec, a bank wholly owned by the Republic of Cuba, in August, 1980. Less than a month after the issuance of the letter of credit, Cuba nationalized Citibank's property through forced expropriation. Undaunted, Bancec brought suit on the letter of credit in February, 1961, in federal court in the United States. A few weeks after the filing of the complaint, Cuba dissolved Bancec and transferred its assets to the Cuban Ministry of Foreign Trade and Cuba's central bank, Banco Nacional de Cuba. Within the week, the assets were again transferred to another government entity, referred to as Empresa, and from it to the current holder, yet another juridical entity, referred to as Cubazucar. Cubazucar is a Cuban "trading company" which is apparently still in existence. *Id.* at ——, 103 S.Ct. at 2594. A motion to substitute Cubazucar as plaintiff was denied by the district court because of concerns that it would further complicate the litigation.

Citibank admitted liability on the letter of credit. However, it sought to set off, against its liability, Cuba's liability to it for the assets seized in the nationalization. Bancec argued that both it and Cubazucar were separate juridical entities, and could not be held responsible for any liability that Cuba might have to Citibank.

The Court ruled that there is a presumption that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at —— – ——, 103 S.Ct. at 2600. However, the presumption may be overcome when, applying "internationally recognized equitable principles," it is necessary to do so to avoid injustice. *Id.* at ——, 103 S.Ct. at 2603. The Court found that the presumption was overcome in *Bancec* because Bancec's assets had devolved upon the Cuban Ministry of Foreign Trade, making Cuba the real beneficiary of any recovery. "Giving effect to Bancec's separate juridical status in these circumstances, even though it has long been dissolved, would permit the real beneficiary of such an action, the . . . Republic of Cuba, to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets . . ." *Id.* Nor was the Court persuaded by the fact that Bancec's assets had been, since 1962, owned by Cubazucar, another independent juridical entity: "To hold otherwise would permit governments to avoid the requirements of international law simply by creating juridical entities whenever the need arises." *Id.*

Both parties argue that *Bancec* supports their respective positions. LAN emphasizes the ruling that juridical entities are to be presumed independent, and argues that even if all of the evidence proffered by the judgment creditors were accepted as truth,

it would not demonstrate that LAN is an "alter ego" of the Republic. The judgment creditors rely on the ruling that equitable principles control, and urge that, under traditional equitable principles, Chile's disregard of the separateness of the corporate entity as demonstrated by its abuse of LAN to carry out the assassination suffices to warrant a "piercing of the juridical veil."

If the evidence proffered by the judgment creditors is to be credited, and we defer momentarily the question of the admissibility and weight of the proofs submitted, it indicates that Chile used LAN to carry out the assassination. There is evidence that LAN was used to transport the assassin back and forth, to transport explosives on several occasions, and to assist with currency transactions involved in paying off the co-conspirators. The LAN VIP lounge was used as a meeting place for the co-conspirators, and a LAN pilot used his "internal account" to arrange for Townley to exit the United States under an alias after the assassination. If these events occurred, and we make no finding at this time as to whether or not they did, they constitute significant steps in the conspiracy. If Chile used LAN in these respects, we believe that would constitute a gross abuse of the corporate form.

LAN's argument that even the sum of the facts set forth above does not make LAN an "alter ego" of Chile misses the point. The Supreme Court did not find that Bancec or Cubazucar were "shams" or alter egoes of Cuba; in fact, the Court explicitly warned against placing excessive emphasis on such "epithets," *id.* at ——, 103 S.Ct. at 2598, or "mechanical formulas," *id.* at ——, 103 S.Ct. at 2603. Instead, the Court concluded that, under the circumstances presented, it would violate interna-

tionally accepted equitable principles to adhere to the corporate form.

We conclude that it would violate similar equitable principles to adhere to the corporate form in the instant action if the facts are as asserted by the judgment creditors. As the record presently stands, the judgment creditors have made a threshold showing that Chile used LAN to facilitate the events in question. If Chile ignored LAN's separate existence in accomplishing the wrong, it may not now invoke that separate existence in order to deny the injured a remedy.[2]

■ We turn now to the question of the admissibility and weight of the evidence in the present record. Much of the evidence appears admissible under various exceptions to the hearsay rule. For example, Congressional reports and statements by various government agencies at House hearings are admissible under F.R.E. 803(8)(C) as reports or statements of public agencies setting forth "factual findings resulting from an investigation made pursuant to authority granted by law." However, the Rule explicitly provides that such statements are inadmissible if "circumstances indicate lack of trustworthiness." Similarly, LAN assistant manager Cruchaga's testimony before the House is admissible as a statement by LAN's "agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship" under F.R.E. 801(d)(2)(D).

While we consider seriously LAN's contentions that the House Report and Hearings are lacking in trustworthiness,[3] we believe that the "[j]ustification for the exception [—] the assumption that a public official will perform his duty properly," Advisory Committee Notes to Exceptions 803(8)—

---

**2.** Surely the equitable principle involved here is at least as strong as that invoked by the Court in *Bancec,* where the only connection with the central government of Cuba was a period of less than a week during which Bancec's assets passed through the Cuban Ministry of Foreign Trade.

**3.** LAN argues that the House Report is not based on first-hand knowledge, and that the information on which it is based is of dubious credibility.

must be particularly strong in the case of the report of a subcommittee of the United States House of Representatives, and that a substantial showing must be made to support the contention that "circumstances indicate lack of trustworthiness."

In any event, the record as it stands is inadequate to prove either that Chile did intentionally use LAN to facilitate the assassination or that it did not. While the showing against Chile is considerable, in a matter of this significance a more fully developed record is appropriate, if not essential. The applicable rules provide the means for discovery in aid of execution.[4]

It should be emphasized that if Chile failed to comply with the judgment creditors' relevant and reasonable discovery demands, and, in effect, defaulted on this second "bite at the apple," the judgment creditors would be entitled to invoke the ordinary rules of evidence and the sanctions provided in Fed.R.Civ.Pr. 37(b).

### III.

As an alternative theory, the judgment creditors argue that, without a showing that would warrant piercing the corporate veil, a judgment creditor is entitled to levy on any assets of its judgment debtor, including corporate shares. Should the judgment debtor be the sole owner of a corporation, the creditor could levy on all of the shares and then liquidate the company. If the shares are secreted, judgment creditors assert, the creditor should be allowed to reach the assets directly. Here, where Chile's ownership in LAN is not represented by shares, the judgment creditors argue that the same principle applies.

LAN argues that the assets of a corporate entity are not subject to execution unless the requirements for piercing the corporate veil are met. Even if such requirements were met here, LAN continues,

LAN is not a state-owned corporation analogous to a wholly-owned American subsidiary company; rather, it is an independent juridical entity.

■ The judgment creditors are correct that under New York law, a judgment creditor may satisfy his judgment by levying on shares of stock owned by the judgment debtor. *Claude Neon, Inc. v. Birrell,* 177 F.Supp. 706, 711 (S.D.N.Y.1959). A court will order the debtor, or his transferee if the shares have been transferred, to "turn over" the shares to the judgment creditor. *Clarkson Co. Ltd. v. Shaheen,* 540 F.Supp. 636 (S.D.N.Y.1982); *Jack London Productions, Inc. v. Samuel Bronston Productions, Inc.,* 22 A.D.2d 870, 254 N.Y.S.2d 397 (1st Dept.1964); *Udell v. Udell,* 82 Misc.2d 882, 370 N.Y.S.2d 426 (N.Y.C.Civ.Ct.1975).

■ However, allowing execution on LAN's assets under this theory alone, without any further proof, ignores the *Bancec* analysis of the role of government instrumentalities. After a discussion of the importance to governments, particularly governments of developing countries, of the presumption of separate juridical entities, the Court states:

"Freely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy the claim against a sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee."

—— U.S. at ——, 103 S.Ct. at 2600. Acceptance of the judgment creditors' "equitable ownership" theory would "result in substantial uncertainty over whether an instrumentality's assets [may] be diverted to satisfy [a] claim against the sovereign," and, accordingly, the theory must be rejected in the circumstances of this case.

4. Rule 69, Fed.R.Civ.Pr., provides that "[i]n aid of the judgment or execution, the judgment creditor ... may obtain discovery from any

person ... in the manner provided in these rules or in the manner provided by the practice of the state in which the district court is held."

## IV.

Having determined that, on an appropriate showing, LAN's assets may be levied upon as Chile's to satisfy the present judgment, the question remains whether execution against Chile's assets is permissible under the FSIA, 28 U.S.C. § 1602 *et seq.* The FSIA, enacted in 1976, provides that unless the action is within one of the specified exceptions, a foreign sovereign is immune from the assertion of federal and state jurisdiction. Sections 1605–1607 set forth the circumstances under which immunity is lifted for purposes of liability; sections 1610–1611 enumerate the circumstances in which assets of a foreign sovereign are without immunity from attachment or execution to satisfy a judgment. Sections 1610–1611 are more limited than sections 1605–1607; that is, only certain assets of a foreign sovereign may be levied upon to satisfy a judgment which is validly entered under 1605–1607.

The judgment creditors argue that they may execute upon Chile's interests in LAN under § 1610(a)(2), which provides:

> "The property in the United States of a foreign state, . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, . . . if—. . . the property is or was used for the commercial activity upon which the claim is based."

It has been established above that LAN's United States assets will be deemed "[t]he property in the United States of a foreign state," Chile, if an appropriate showing is made as set forth in section II of this opinion. Further, it is undisputed that the airplanes on which the judgment creditors seek to execute are "used for a commercial activity in the United States." The applicability and interpretation of the remaining provisions of the section, however, are subject to vigorous dispute.

LAN argues that § 1610(a)(2) is unavailable to the judgment creditors because they secured their judgment under the jurisdictional provision allowing for tort claims, § 1605(a)(5), as opposed to the jurisdictional provision for commercial claims, § 1605(a)(2). In addition, LAN argues that even if § 1610(a)(2) is available to the judgment creditors, its terms are not met because LAN's conduct, even if proven, is not "commercial activity," and, even if it is commercial activity, it is not "the commercial activity upon which the claim is based."

The judgment creditors answer that there is no indication in the statute that § 1610(a)(2) execution was intended to be unavailable for tort claims, and that, in any event, they did not assert jurisdiction solely on the basis of the tort provision, § 1605(a)(5). They further argue that the activities of LAN on which the claim is based are commercial activities—in fact, that they are the standard commercial activities of an airline—providing and assisting with the air transport of passengers and their baggage. In addition, they argue that LAN advocates too narrow an interpretation of the words "upon which the claim was based": the judgment creditors propose that any activity which was a significant step in giving rise to the cause of action is an activity "upon which the claim is based."

One would be hard pressed to exaggerate the difficulty of interpreting the Foreign Sovereign Immunities Act. As Judge Kaufman recently explained, the statute was deliberately left vague, so as to provide only " 'very modest guidance' on issues of preeminent importance. For answers to these most difficult questions, the authors of the law 'decided to put [their] faith in the U.S. courts.' " *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 302, 303 (2d Cir.1981), *quoting Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary,* 94th Cong., 2d Sess. 53 (1976), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). One point that does emerge clearly from the legislative

history, however, is that the burden of establishing FSIA immunity lies with the party claiming it. H.R.Rep. No. 94–1487, 94th Cong., 2d Sess., reprinted in [1976] U.S.Code Cong. & Admin.News 6604.

**A. Are §§ 1610(a)(2) and 1605 (a)(5) "Mutually Exclusive?"**

█ As noted above, LAN argues that a plaintiff who asserts jurisdiction under the tort section, 1605(a)(5), may not collect on his judgment under § 1610(a)(2), which LAN contends is available only in commercial cases.[5]

As an initial matter, there is nothing logically inconsistent about the judgment creditors' contention that the same asset can be used simultaneously in both tortious and commercial activity. Any number of activities may be both commercial and tortious, such as, for example, the conduct giving rise to a garden-variety products liability suit. Thus, the fact that Congress indicated in § 1610(a)(2) its intent to permit execution only on commercial assets used for commercial activities does not, by itself, demonstrate an intent to preclude § 1610(a)(2) from being available to satisfy claims grounded in tort, so long as the assets on which the judgment creditor seeks to execute were also used commercially in the activity giving rise to the claim.

LAN is correct that there is a strong verbal similarity between the provision lifting jurisdictional immunity in commercial cases, § 1605(a)(2)[6] and the provision in question, § 1610(a)(2), which lifts execution immunity as to commercial assets. However, the verbal similarity between the two sections is not dispositive because a statute must be read and interpreted as a whole.

In addition to the exception to execution immunity in § 1610(a)(2) for "property used for the commercial activity upon which the claim is based," the statute also excepts from execution immunity a foreign sovereign's assets where the judgment in question established rights to property:

(a) which was taken in violation of international law, § 1610(a)(3);

(b) which was acquired by succession or gift, § 1610(a)(4)(A); or

(c) which is "immovable," § 1610(a)(4)(B).

A foreign sovereign's assets may also be executed upon if the sovereign has waived its execution immunity, § 1610(a)(1), or, to the extent of its insurance coverage, if the sovereign has taken out a liability insurance policy covering the claim in question, § 1610(a)(5). Nothing in the statute, of course, requires a sovereign to acquire liability insurance.

Viewing the statute as a whole, one notes that, if LAN's interpretation of the statute were correct, a judgment creditor on a tort claim could not execute upon his judgment unless the foreign sovereign magnanimously chose to waive its execution immunity or to take out insurance in order to satisfy possible judgments from which it would otherwise be immune from execution. Having determined to grant jurisdiction in both commercial and tort claims, it appears out of joint to conclude that Congress intended the surprising result of allowing only commercial creditors to execute on their judgments.

While both parties' interpretations of the literal language of § 1610(a)(2) are support-

---

**5.** It is unnecessary to dwell at length on the judgment creditors' argument that jurisdiction of the action was not based solely on § 1605(a)(5). Judge Green's decision opinion finding jurisdiction discussed only § 1605(a)(5). 488 F.Supp. 665. While it may be that, as the judgment creditors contend, Judge Green focused on § 1605(a)(5) because that was the provision to which Chile's memorandum of law addressed itself, the fairer reading of the opinion is that jurisdiction was found to be availa-

ble under § 1605(a)(5) without consideration of the other possible bases.

**6.** Section 1605(a)(2) provides "A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is based upon a commercial activity carried on in the United States by a foreign state."

able, we favor the judgment creditors' interpretation because, in the absence of a clear indication of Congressional intent, a statute is not ordinarily interpreted to create a right without a remedy.[7] Accordingly, we conclude that § 1610(a)(2) and 1605(a)(5) are not mutually exclusive.

B. *Is LAN's Conduct "Commercial Activity?"*

■ Section 1610(a)(2) allows for execution only on assets used in the "commercial activity upon which the claim is based." The commercial activity on which the judgment creditors rely is LAN's assistance to and transportation of Townley and his lethal equipment. LAN argues that any services it provided to Townley and his cohorts were noncommercial because (a) according to the judgment creditors' view of the facts, the services were provided at the government's behest, which, it is claimed, makes them noncommercial under *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371 (5th Cir.1980); and (b) services for which a corporation does not receive compensation are by definition noncommercial. The judgment creditors respond that carriage of passengers and goods is the archetypal commercial activity of an airline, and that the issues whether LAN acted at government direction and whether LAN was compensated go to the reasons for the activity, which, under the statutory language, are not pertinent.

"Commercial activity" is defined by the statute as follows:

> "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, *rather than by reference to its purpose.*"

28 U.S.C. § 1603(d). (Emphasis added). The statutory admonition to look to the "nature of the course of conduct . . . rather than . . . its purpose" firmly supports the judgment creditors' position that the issue is what LAN did, not why they did it.

The question of what constitutes commercial activity under the FSIA has been the subject of several decisions in this Circuit, the seminal case being *Texas Trading, supra,* in which Judge Kaufman provided the following rule of thumb: "if the activity is one in which a private person could engage, it is not entitled to immunity" as noncommercial activity. 647 F.2d at 309. *Texas Trading* involved Nigeria's breach of a contract to buy cement. The court ruled: "Nigeria's activity here is in the nature of a private contract for the purchase of goods. Its purpose—to build roads, army barracks, whatever—is irrelevant." *Id.* at 310.

Further elaboration of the "commercial activity" concept is provided by *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094 (S.D.N.Y.1982). *Gibbons* concerned an action against two instrumentalities of the Republic of Ireland that established an office in the United States to encourage American companies to open plants in Ireland. As a defense against claims by American businesses which alleged that they had been fraudulently induced to relocate in Ireland, the entities contended that their activities—arranging government grants, facilitating relations with Irish companies, promoting investment in Ireland— were not "commercial activities," but rather governmental activities, intended, not for profit, but to foster the Irish government's goals. Applying Judge Kaufman's rule of thumb, the court found that the entities were involved in "commercial activity":

> "While it may well be . . . that IDA exists in order to serve a purpose integral

---

7. The fact that the statute, as interpreted by LAN, would allow tort creditors to collect on judgments where foreign sovereigns had waived their immunity or taken out insurance in favor of possible claimants is hardly persuasive. Had Congress intended tort victims to be relegated to relying on the munificence of foreign sovereigns, it would have been unlikely to lift sovereign immunity over tort claims. The ordinary assumption is that where one has a legal right to sue, he will have a legal right to collect.

to the Irish government's plans ... the promotional activities that IDA ... allegedly engaged in here are, *by nature,* no different at all from the promotional activities engaged by a private public relations firm."

549 F.Supp. at 1110 (emphasis in original). See also *United Euram Corp. v. U.S.S.R.,* 461 F.Supp. 609 (S.D.N.Y.1978) (action of Soviet "concert society" in arranging to send Soviet artists abroad pursuant to American-Soviet cultural exchange agreement is "commercial activity" because the nature of the activity is the sale of services).

Having reviewed the precedent on point in this Circuit, we turn to the cases decided in other circuits upon which LAN relies, in particular, *Arango v. Guzman Travel Advisors Corp., supra,* and *Perez v. The Bahamas,* 482 F.Supp. 1208 (D.D.C.1980), *aff'd* 652 F.2d 186 (D.C.Cir.), *cert. denied,* 454 U.S. 865, 102 S.Ct. 326, 70 L.Ed.2d 166 (1981). *Arango* was a suit by Americans who had signed up for a package vacation tour in the Dominican Republic, but who, upon arrival in Santo Domingo, were forcibly placed back on the airplane by Dominican immigration officials and airline personnel, and sent, against their will, to Puerto Rico. The court held that their claims for false imprisonment and battery involved noncommercial conduct, but that their claim for nonperformance of the package vacation tour was commercial.

The result in *Arango* is entirely consistent with Judge Kaufman's rule of thumb: a private person, acting without government sanction, could not force someone onto an airplane and deport him to a foreign country. Such action is not commercial—it may be criminal. Nor would it be of consequence that the private actor had been paid a fee: kidnapping, if that is what it was, for profit would still be kidnapping.

To the extent that the *Arango* decision turned on the court's view that the activities were noncommercial because performed at the behest of the government, the case is not persuasive. In the first place, such a rationale would not even be consistent within the *Arango* decision itself: cancellation of the package vacation tour was equally at the behest of the government, yet it was deemed commercial.

More important to deem an activity "commercial" on the grounds that it is performed at the government's behest would be inconsistent with the statute, which requires the court to look at *what* the defendant did, not whether he did it to follow the government's instructions or for any other reason. For that matter, the cancellation of the cement contracts in *Texas Trading* was done at government behest, yet it was deemed commercial activity.

Little additional comment is needed on *Perez v. The Bahamas, supra,* an action arising from the Bahamian marine police shooting at an American fishing boat suspected of violating Bahamian fishing laws. Again, the conduct of the Bahamian police in shooting at a fishing boat is not an activity "in which a private person could engage," *Texas Trading, supra.*

Applying the case law cited above to the circumstances at issue, we conclude that LAN's actions in assisting and transporting Townley are "commercial activity" within the meaning of the FSIA. Transporting and assisting a passenger is an activity in which a private person could engage; LAN's motives are of no relevance on this point.

Nor is it pertinent whether or not LAN received a fee for its various tasks.[8] For the purpose of the statute, noncommercial activity is not converted into commercial activity by the receipt of compensation; a private person cannot shoot at another fishing boat whether he is paid to do so or not. The reverse is also true: commercial airlines routinely assist passengers beyond the requirements of the contract of passage, by,

---

**8.** The record does not establish whether or not Townley paid LAN.

for example, arranging car rentals, allowing them to use airline lounges, and permitting them to carry excess baggage on board the plane. Because such actions are actions "in which a private person could engage," the fact that Townley may not have paid a fee does not make the *nature* of the conduct noncommercial. *See Gibbons v. Udaras na Gaeltachta, supra,* 549 F.Supp. at 1110.

C. *Is LAN's Conduct "The Commercial Activity Upon Which the Claim is Based?"*

LAN argues that the "activity upon which the claim is based" should be interpreted to mean the central or pivotal activity on which the claim is based, which, in this case, is the assassination itself.

The judgment creditors urge a broader reading of the statute: they argue that any activity from which the claim arose may serve as the "basis" of the claim for the purposes of § 1610(a)(2).

No authority has been found on the interpretation of this aspect of § 1610(a)(2). However, several cases have construed the similar phrase, "based upon commercial activity," that appears in FSIA § 1605(a)(2):

"A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is based upon a commercial activity carried on in the United States by a foreign state."

The courts of this Circuit have given a very broad reading to the question of whether an action is "based upon" a given activity. *Gemini Shipping, Inc. v. Foreign Trade Organization,* 647 F.2d 317 (2d Cir. 1981) (Kaufman, J.), was an action by a vessel charterer against the owner of the vessel's cargo for demurrage incurred as a result of a 115-day delay in a Syrian port. The cargo owner had guaranteed that it would pay for all demurrages. The cargo, rice, had been purchased by two Syrian instrumentalities through bids solicited in the United States under the "P.L. 480" food purchase program, 7 U.S.C. 1691 *et seq.* The district court ruled that the claim was

not "based upon a commercial activity carried on in the United States by a foreign state" under § 1605(a)(2), because the vessel charterer was not involved in the purchase and sale of the rice, and that there was thus "no nexus between the demurrages and the guarantee thereof and such activities as the plaintiff would ascribe to the defendant occurring in the United States." 496 F.Supp. 256, 258 (S.D.N.Y.1980).

The Court of Appeals rejected the district court's interpretation of the basis of the claim as being too "niggardly." 647 F.2d at 319. The court ruled that the charterer's suit for demurrages was " 'based upon' the commercial activity because the guarantee [of the demurrages] was part and parcel of the rice sale." *Id.*

The Second Circuit has recently affirmed the *Gemini* interpretation of "based upon" in *Ministry of Supply v. Universe Tankships, Inc.,* 708 F.2d 80 (2d Cir.1983) (Friendly, J.). *Ministry of Supply* concerned a complaint by the charterer of a vessel against the Egyptian Ministry of Supply. The charterer alleged that the Ministry had "wrongfully halted the discharge [of the vessel] at Port Said[, Egypt] and thus wrongfully denied [the charterer] its rightful use of the vessel." At 83. The Ministry, like the Syrian instrumentalities in *Gemini,* had purchased the cargo which was on the vessel through the United States P.L. 480 program, which involved actions by the Ministry in the United States. The court found that the Ministry was subject to jurisdiction under § 1605(a)(2) because the charterer's claim that the Ministry "wrongfully halted the discharge" in Egypt was " 'based upon' [the Ministry's] entire course of activity in arranging in the United States for the purchase of the wheat and its transportation to Egypt, not simply on the acts done (or not done) by [the Ministry] in the course of unloading at Port Said." At 84.

The Third Circuit has taken an even broader view of the "basis" of an FSIA claim. In *Sugarman v. Aeromexico, Inc.,*

626 F.2d 270 (3d Cir.1980), an American traveler claimed that he had been forced to endure 15 hours in a Mexican airport "under extremely brutal conditions" because Aeromexico, from whom he had purchased a ticket, had failed to "exercise due care." The district court held that jurisdiction as to Aeromexico did not lie under § 1605(a)(2) because the action was not based on commercial activity in the United States, but rather a tort in Mexico. The Third Circuit reversed, stating:

> "The record contains ... information which tends to show a *nexus* between Sugarman's grievance and Aeromexico's commercial activity carried on in the United States."

626 F.2d at 272 (emphasis added). *See also In re Rio Grande Transport, Inc.,* 516 F.Supp. 1155, 1161–62 (S.D.N.Y.1981) (Pierce, J.) (action on collision between two ships in the Mediterranean sea "based upon a commercial activity carried on in the United States" because the defendant's vessels called regularly at United States ports).

These decisions compel the conclusion that LAN's interpretation of the phrase "activity upon which the claim is based" as including only the central or pivotal activity is too "niggardly," in the words of the Court of Appeals in *Gemini.* The judgment creditors' claim here is "based upon the entire course of activity," *Ministry of Supply, supra,* at 84, in arranging, facilitating, and carrying out the assassination. The record indicates a substantial "nexus" between the judgment creditors' grievance and LAN's commercial activity. *See Sugarman v. Aeromexico, supra,* at 272.

For the reasons stated above, we conclude that § 1610(a)(2) lifts execution immunity from LAN and the Republic of Chile in the circumstances of this case.

## V.

█ LAN's final argument is that permitting execution against its assets to satis-fy Chile's liability would violate due process because LAN had no opportunity to defend on the merits against the judgment creditors' claim. This position has been implicitly rejected by the discussion above concerning piercing the corporate veil; that is, if internationally recognized principles of equity require the piercing of the corporate veil, it follows that general notions of due process are not thereby offended.

Moreover, if due process precluded execution on LAN's assets, it would equally have precluded the result in *Bancec.* To reiterate briefly, Citibank was permitted to assert against Bancec a debt owed to Citibank by the Republic of Cuba, although Bancec was not a party to any proceedings adjudicating the liability of Cuba to Citibank. We are confident that the Supreme Court would not have allowed Citibank's set-off against Bancec had it violated Bancec's due process rights, and we see no basis for distinguishing LAN's position in this respect from Bancec's.

*Conclusion*

As we have observed above, the record is incomplete as to whether Chile's conduct was such that, under the analysis of Section II, *supra,* it would warrant disregarding LAN's separate juridical status. Accordingly, decision on the application is reserved pending submission of a more fully developed record.[9] It bears repeating that, should Chile default on its obligations to produce pertinent witnesses and documents, the ordinary presumptions against a party that fails to produce evidence could be invoked.

It is so ordered.

---

**9.** It is unnecessary to reach, at this time, the question whether appointment of a receiver is the appropriate mechanism for execution on this judgment. However, there appears to be considerable merit to the judgment creditors' approach. *See generally,* 6 New York Civil Practice, J. Weinstein, H. Korn, & A. Miller, ¶ 5228.04 (1982 ed.) (standards for appointment of a receiver).