Isabel Morel De LETELIER, et al.,
Judgment Creditors-Appellees,

v.

The REPUBLIC OF CHILE, also doing
business as Linea Aerea Nacional-Chi-
le, Judgment Debtor,

and

Linea Aerea Nacional-Chile,
Garnishee-Appellant.

No. 1251, Docket 83–9048.

United States Court of Appeals,
Second Circuit.

Argued May 14, 1984.

Decided Nov. 20, 1984.

Gerald D. Morgan, Jr., New York City (Thomas E. Engel, Carter K. Combe and Robert P. Knapp, III, Hale, Russell & Gray, New York City, of counsel), for garnishee-appellant.

William J.T. Brown, New York City (Joseph P. Cyr, Mary Landergan Kibbe, Donovan Leisure Newton & Irvine, New York City, Michael E. Tigar, Samuel J. Buffone, John J. Privitera, Tigar & Buffone, Washington, D.C., of counsel), for judgment creditors-appellees.

Before CARDAMONE and PRATT, Circuit Judges and BONSAL, District Judge.[*]

CARDAMONE, Circuit Judge:

The critical question posed on this appeal is whether the assets of a foreign state's wholly owned airline are subject to execution to satisfy a default judgment obtained against the foreign state. The district court, believing that Congress under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602–11 (1982) (FSIA or the Act), would not have established a right to jurisdiction over the foreign state without

also providing a remedy, ordered execution. We reverse although we recognize that our decision may preclude the plaintiffs from collecting on their judgment. How one wishes to decide a case comes lightly to mind, on a wing; but often how one must decide it comes arduously, weighed down by somber thought. To rule otherwise here would only illustrate once again that hard cases make bad law.

FACTS

Orlando Letelier, the former Chilean Ambassador to the United States, his aide, Michael Moffitt, and Moffitt's wife, Ronni, were riding to work in Washington, D.C. in September, 1976 when an explosive device planted under the driver's seat in their car was detonated killing both Letelier and Ronni Moffitt and seriously injuring Michael Moffitt. That assassination gives rise to the present appeal.

Investigation by agencies of the United States government into these murders revealed the identity of nine assassins and their alleged connection to the government of Chile. Of the nine only Michael Vernon Townley, an American citizen working for Chilean intelligence, was convicted of a criminal offense. Three of those indicted were members of the Cuban Nationalist Movement who, although found guilty in the trial court, had their convictions reversed on appeal. *See United States v. Sampol,* 636 F.2d 621, 684 (D.C.Cir.1980). Of the other five individuals indicted, none were brought to trial: three were Chilean nationals that Chile refused to extradite, and two remain at large.

In August 1978 the personal representatives of Letelier and Moffitt instituted a civil tort action in the United States District Court for the District of Columbia against the indicted individuals and the Republic of Chile. The complaint asserted five causes of action: (1) a conspiracy to deprive Letelier and Moffitt of their civil

---

[*] Honorable Dudley B. Bonsal, United States District Court Judge for the Southern District of New York, sitting by designation.

rights under 42 U.S.C. § 1985; (2) assault and battery; (3) reckless transportation and detonation of explosives; (4) violation of the "law of nations" (international law); and (5) murder of an internationally protected person under 18 U.S.C. § 1116. The complaint alleged that the noncommercial tort exception of § 1605(a)(5) of the FSIA applied and that Chile was not entitled to sovereign immunity in the tort action.

All defendants defaulted, although Chile sent two Diplomatic Notes to the United States Department of State asserting its sovereign immunity and that the allegations against it were false. The State Department forwarded these Notes to the clerk of the district court. In August 1978 the trial court granted default judgments against the individual defendants. During 1979 and 1980 the district court heard plaintiffs' motion for a default judgment against Chile, *see Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.D.C.1980), and finally resolved that motion. *See Letelier v. Republic of Chile*, 502 F.Supp. 259 (D.D.C.1980). In the former case, the court ruled that it had subject matter jurisdiction pursuant to the exception to immunity found in § 1605(a)(5) of the Act. In the latter case the trial court relying on Townley's testimony at the criminal trial, where he had pled guilty and testified for the prosecution, granted a default judgment against the Republic of Chile and awarded plaintiffs over five million dollars including interest, compensatory and punitive damages, counsel fees and out-of-pocket expenses. The Republic of Chile did not take an appeal from either of these judgments.

The resulting judgment against the Republic of Chile was entered in the United States District Court for the District of Columbia. Plaintiffs subsequently filed the judgment in the United States District Court for the Southern District of New York, *see* 28 U.S.C. § 1963 (1982), for the purpose of executing on the property interests that The Republic of Chile has in the Chilean national airline, Linea Aerea Nacional-Chile or LAN, which is located in New York, and for the appointment of Michael Moffitt as a receiver of those interests to satisfy the judgment against Chile pursuant to New York's CPLR 5228 and Fed.R.Civ.P. 69. The application for execution against LAN's assets came before District Court Judge Morris E. Lasker. LAN moved to dismiss claiming that it should not be held to answer for Chilean debts and that its assets were immune from execution. Relying upon a recent decision of the United States Supreme Court, *First National City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983), which based a decision to disregard separate corporation identities on "international equitable principles," Judge Lasker first held in an opinion and order dated July 28, 1983 that, were the facts as asserted, LAN's role in the assassination was commercial activity under the Act. He further held that to adhere to LAN's separate corporate identity would, as in *Bancec*, violate equitable principles. *Letelier v. Republic of Chile*, 567 F.Supp. 1490, 1496 (S.D.N.Y. 1983).

Having concluded that LAN's assets were subject to execution to satisfy a judgment against Chile, the district court concluded that the language of § 1610(a)(2) did not limit execution only to commercial assets used for commercial purposes, as LAN claimed, but also permitted execution to satisfy tort judgments "so long as the assets on which the judgment creditor seeks to execute were also used commercially in the activity giving rise to the claim." *Id.* at 1499. The rationale for this reading of the statute was that a statute should not be interpreted to create a right without a remedy. The court reasoned that if jurisdictional immunity is lifted, the presumption is that there will be a right to execute. *Id.* at 1500 & n. 7.

Plaintiffs later sought discovery against The Republic of Chile by serving it with interrogatories and requests to produce documents and admit facts. Chile refused to comply and again filed Diplomatic Notes asserting its refusal to recognize either the validity of the default judgment or the district court's jurisdiction in the supple-

mentary proceedings for enforcement. Judge Lasker in an order dated December 20, 1983 granted plaintiff's motions for Rule 37 sanctions against LAN consisting of adverse findings of fact that provided a basis to disregard LAN's juridical separateness, and appointed Moffitt as a receiver of LAN's assets in the United States. 575 F.Supp. 1217 (S.D.N.Y.1983). From the rulings of July 28 and December 20, 1983 LAN has appealed and raised a number of issues.

### DISCUSSION

■ The principal issue is whether LAN's assets may be executed upon to satisfy the judgment obtained in the District of Columbia against Chile. This discussion necessarily focuses on the Foreign Sovereign Immunities Act of 1976, which is the exclusive source of subject matter jurisdiction over all suits involving foreign states or their instrumentalities. *Rex v. CIA Pervana de Vapores, S.A.*, 660 F.2d 61, 62 (3d Cir.1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982). According to § 1604, foreign states are immune from suit in our courts unless the conduct complained of comes within the exceptions set forth in §§ 1605 to 1607 of the Act. Similarly, under § 1609 foreign states are immune from execution upon judgments obtained against them, unless an exception set forth in §§ 1610 or 1611 of the FSIA applies.

The judgment creditors claim that § 1610(a)(2) allows them to execute upon LAN's assets in this case. Section 1610(a)(2) provides:

> The property in the United States of a foreign state ... used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution ... if ... the property is or was used for the commercial activity upon which the claim is based....

We consider first whether LAN's separate juridical existence may be ignored, thereby making its assets "[t]he property in the United States of a foreign state."

### I  *Separate Juridical Existence*

In *Bancec* the Supreme Court determined whether a claim of a foreign agency plaintiff was subject to a set-off for the debts of its parent government. *Bancec* deserves close scrutiny because it provides a conceptual framework for resolving plaintiffs' assertion that LAN's assets should be treated as assets of Chile and because the district court relied on it to reach that conclusion.

In *Bancec*, the Cuban bank of the same name brought suit against Citibank to collect on a letter of credit issued in its favor in 1960. Citibank counterclaimed arguing that it was entitled to set-off amounts as compensation due it for the Cuban government's expropriation of Citibank's assets in Cuba. We ruled that as Bancec was not the alter ego of the Cuban government, it could not be held to account for Cuban debts. The Supreme Court reversed. Relying on the Act's legislative history, the Court noted that it was not intended to affect the substantive law of liability of a foreign state or the attribution of liability among its entities and proceeded to resolve the appeal on "equitable principles." The *Bancec* Court recognized that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." 103 S.Ct. at 2600. FSIA's legislative history provided support for that conclusion:

> Section 1610(b) will not permit execution against the property of one agency or instrumentality to satisfy a judgment against another, unrelated agency or instrumentality. There are compelling reasons for this. If U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. corporations or between a U.S. corporation and its independent subsidiary. However, a court might find that property held by one agency is really the property of another. H.R.Rep.

No. 94–1487, pp. 29–30, U.S.Code Cong. & Admin.News 1976, 6604, pp. 6628, 6629 (citation omitted.)

The Supreme Court concluded in *Bancec* that the presumption of separateness had been overcome. It reasoned that the real beneficiary of any recovery would be the Cuban government, and that Cuba should not be permitted to obtain relief in American courts without answering for its seizure of Citibank's assets. The Court commented that "Cuba cannot escape liability for acts in violation of international law simply by retransferring the assets to separate juridical entities." 103 S.Ct. at 2603.

■ Thus, *Bancec* rests primarily on two propositions. First, Courts may use set-off as a unique, equitable remedy to prevent a foreign government from eluding liability for its own acts when it affirmatively seeks recovery in an American judicial proceeding. *See National City Bank v. Republic of China*, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955). The broader message is that foreign states cannot avoid their obligations by engaging in abuses of corporate form. The *Bancec* Court held that a foreign state instrumentality is answerable just as its sovereign parent would be if the foreign state has abused the corporate form, or where recognizing the instrumentality's separate status works a fraud or an injustice.

The district court analyzed the present case in light of *Bancec* and ruled that Chile's alleged use of LAN to transport Townley and explosives to the United States were "significant steps in the conspiracy" that if proven "would constitute a gross abuse of the corporate form." 567 F.Supp. at 1496. Accordingly, it held, "If Chile ignored LAN's separate existence in accomplishing the wrong, it may not invoke that separate existence in order to deny the injured a remedy." *Id.* at 1496.

The district judge "found" the following facts based "on the record" and "established" by evidentiary sanctions imposed pursuant to Rule 37(b)(2)(A): From January 1975 through January 1979 LAN's assets and facilities were under the direct control of Chile, which had the power to use them; Chile could have decreed LAN's dissolution and taken over property interests held in LAN's name; Chile, through its agencies, officers, and employees, intentionally used facilities and personnel of LAN to plan and carry out its conspiracy to assassinate Orlando Letelier by (a) transporting Michael Vernon Townley between Chile and the United States, (b) transporting explosives on several occasions, (c) assisting with currency transactions involved in paying off the co-conspirators in the assassination, (d) providing a meeting place for the co-conspirators, (e) arranging for Townley to exit the United States under an alias after the assassination. By using LAN in these endeavors, the district court found, Chile ignored LAN's separate existence and abused the corporate form.

■ In our view this is not the sort of "abuse" that overcomes the presumption of separateness established by *Bancec*. Joint participation in a tort is not the "classic" abuse of corporate form to which the Supreme Court referred. In *Bancec* the Court relied by analogy on the domestic law of private corporations that ignores separate juridical status "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," where "the corporate form ... is interposed to defeat legislative policies," or where recognition of corporate form " 'would work fraud or injustice.' " 103 S.Ct. at 2601. The facts that the district court "found" here do not add up to anything that resembles the abuses in the decisions cited in *Bancec*. None of these facts shows that Chile ignored LAN's separate status. Instead, they simply demonstrate that Michael Townley was able to enlist the cooperation of certain LAN pilots and officials with whom he had a pre-existing social relationship in pursuing his sinister goal. There was no finding that LAN's separate status was established to shield its owners from liability for their torts or that Chile ignored ordinary corporate formalities. *See Establissement Tomis v. Shearson Hayden Stone*, 459 F.Supp.

1355, 1365 (S.D.N.Y.1978); *Brunswick Corp. v. Waxman*, 459 F.Supp. 1222, 1229 (E.D.N.Y.1978).[1]

Plaintiffs had the burden of proving that LAN was not entitled to separate recognition. A creditor seeking execution against an apparently separate entity must prove "the property to be attached is subject to execution." *Palmiter v. Action, Inc.*, 548 F.Supp. 1166, 1172 (N.D.Ind.1982). *See In re Beck Indus.*, 479 F.2d 410, 417 (2d Cir.1973); *Mission Bay Campland v. Sumner Financial Corp.*, 71 F.R.D. 432, 435 (M.D.Fla.1976). The evidence submitted by the judgment creditors does not reveal abuse of corporate form of the nature or degree that *Bancec* found sufficient to overcome the presumption of separate existence. As both *Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness, we decline to extend the *Bancec* holding to do so in this case.[2]

## II  Commercial Activity

Even assuming the district court was correct in disregarding LAN's corporate form and finding that LAN's assets were Chile's property in the United States, § 1610(a)(2) also requires that the property be "used for the commercial activity upon which the claim is based." In permitting execution against LAN's assets the court below essentially concluded that LAN's activities aided Townley in the assassination and constituted the "commercial activities"

that § 1610(a)(2) requires. We cannot agree because a consistent application of the Act, analysis of the background of its enactment, its language and legislative history, and the case law construing it compel the opposite conclusion.

We first note that the district court for the District of Columbia found that Chile lost its immunity from jurisdiction pursuant to § 1605(a)(5), the "tortious activity" exception to jurisdictional immunity. Section 1605(a)(5) specifically states that it applies to situations "not otherwise encompassed in paragraph (2)." Section 1605(a)(2) is the commercial activity exception. This language suggests that the commercial activity exception to jurisdictional immunity under (2) and the tort exception under (5) are mutually exclusive. If the district court in the District of Columbia lifted jurisdictional immunity based on its finding that the activities complained of were tortious, not commercial, it is inconsistent for this court to lift execution immunity based on a finding that the activities were commercial.

Our disagreement with the finding that LAN's activities were commercial rests on more than the resulting lack of symmetry in application of the FSIA. If LAN, as the trial court found, acted in complicity with the Chilean secret police in the assassination, its activities had nothing to do with its place in commerce. The nature of its course of conduct could not have been as a

1. Further, an "injustice" might be inflicted on third parties were LAN's separate status so easily ignored. Here, plaintiffs are attempting to obtain an affirmative recovery against a foreign agency; no equitable set-off is involved. Under these circumstances abuse of corporate form must be clearly demonstrated to justify holding the "subsidiary" liable for the debts of its sovereign "parent," particularly, where, as here, LAN apparently has non-party private bank creditors. Concern for these non-party creditors is stronger in this case as the net result will be an out-of-pocket loss to LAN. To adopt a rule facilitating an easy piercing of the corporate veil threatens the interests of such unsuspecting third parties.

2. Our conclusions regarding LAN's separate juridical status are strengthened by our finding

that in its December 20 order the district court incorrectly determined evidentiary issues adversely to LAN based solely on Chile's failure to comply with discovery requests. Rule 37 sanctions ensure that a party will not benefit from non-compliance with discovery orders. Yet, one party to litigation will not be subjected to those sanctions because of the failure of another to comply with discovery, absent a showing that the other party controlled the actions of the non-complying party. 4A J. Moore, Moore's Federal Practice ¶ 37.05 at 37–106, 107 (2d ed. 1984). *See, e.g., Bon Air Hotel v. Time, Inc.*, 376 F.2d 118 (5th Cir.1967); *Illinois Central R.R. Co. v. Templar*, 463 F.2d 972 (10th Cir.1972). Here there was no finding by the district court based on independent evidence that the actions of LAN and Chile are one and the same.

merchant in the marketplace. Its activities would have been those of the foreign state: governmental, not private or commercial.

Chief Justice Marshall with his decision in *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812) upheld France's plea of sovereign immunity. In that case American citizens claimed ownership of a French vessel of war berthed in Philadelphia. The executive department recommended to the Supreme Court that it dismiss the claim and the Supreme Court complied with that suggestion. After *The Schooner Exchange* it became the rule that American courts would exercise jurisdiction over foreign states unless the matter was intimately connected with foreign policy and the executive department charged with the conduct of foreign policy asked for judicial abstention. In 1976 Congress, acting pursuant to its Article I powers, changed that practice by enacting the Foreign Sovereign Immunities Act. The Act assigns the task of deciding whether a foreign sovereign is immune solely to federal and state courts sitting without juries.

The FSIA adopts a restrictive view of sovereign immunity. The absolutist view, which found foreign sovereigns immune from suit for any activity, fell into disfavor in other countries and a more restrictive rule succeeded it. In 1952 the United States Department of State signalled with its Tate Letter, 26 Dep't of State Bull. 984, that it embraced the new rule. *See National City Bank of New York v. Republic of China,* 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955). This restrictive view grants immunity for "governmental" acts of a foreign state and denies it for acts of a "private" nature. This translates into the "commercial activity" exceptions in the FSIA.

FSIA § 1602 contains the findings and declaration of purpose for the Act. That section states:

Under international law, states are not immune from the jurisdiction of foreign courts insofar as their *commercial activities* are concerned, and their commercial property *may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities.* (emphasis furnished).

Under § 1603(d) commercial activity is defined as "either a regular course of commercial conduct or a particular commercial transaction or act." S.Rep. No. 94-1310, 94th Cong., 2d Sess. (1976) (Senate Report) recognizes that activities fall along a "spectrum" bounded by "commercial" behavior on one end of the spectrum and "governmental" activity on the other:

Certainly, if an activity is customarily carried on for profit, its commercial nature could readily be assumed. At the other end of the spectrum, a single contract, if of the same character as a contract which might be made by a private person, could constitute a "particular transaction or act."

*Id.* at 15. The Senate Report contains examples of commercial activities:

Activities such as a foreign government's sale of a service or product, its leasing of property, its borrowing of money, its employment or engagement of laborers, clerical staff or public relations or marketing agents or its investment in a security of an American corporation, would be among those included within the definition.

*Id.* at 16. Congress specifically designed the execution immunity rules to "conform" to the jurisdictional immunity provisions of § 1605. H.R.Rep. No. 94-1487, 94th Cong.2d Sess. (1976), *reprinted in* 1976 U.S. Code Cong. & Ad.News 6604, 6626 (*House Report*).

Congress intended the "essential nature" of given behavior to determine its status for purposes of the commercial activities exception, and gave the courts a "great deal of latitude" to decide this issue. *Id.* at 6615. The legislative history makes clear that courts should not deem activity "commercial" as a whole simply because certain aspects of it are commercial. The example given is that the AID programs remain governmental even though they in-

volve behavior traditionally performed by private persons.

■ The district court correctly noted that under § 1603(d) the court must inquire into the nature of conduct, not its purpose, to determine if it is "commercial." *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 310 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982) (Nigerian government's purchase of cement was a commercial activity irrespective of its purposes for so doing). The commercial activity exception of § 1605(a)(2) has been interpreted broadly, *In re Rio Grande Transport*, 516 F.Supp. 1155, 1162 (S.D.N.Y. 1981). "The determination of whether particular behavior is 'commercial' is perhaps the most important decision a court faces in an FSIA suit." *Texas Trading*, 647 F.2d at 308. As with any statutory term, the "commercial activity" requirement must be given a logical and reasonable interpretation. Inquiry therefore ordinarily focuses on whether the specific acts are those that private persons normally perform. *See Texas Trading & Milling Corp., supra*, 647 F.2d at 309; *Rios v. Marshall*, 530 F.Supp. 351, 371–72 (S.D.N.Y.1981); *cf. Gibbons v. Udaras na Gaeltachta*, 549 F.Supp. 1094, 1110–11 (S.D.N.Y.1982) (joint venture agreement with private corporation is "commercial activity"). Yet, not every act of a foreign state that could be done by a private citizen in the United States is "commercial activity," *see In re Sedco, Inc.*, 543 F.Supp. 561, 565 (S.D.Tex. 1982) (holding that the Mexican national oil company's drilling of the infamous IXTOC I well in the Gulf of Mexico was not "commercial activity"). The court must inquire whether the activity is of the type an individual would customarily carry on for profit. *Gibbons*, 549 F.Supp. at 1110. One of the few decisions that has construed § 1610(a)(2) also searched for evidence of a profit motive on the foreign sovereign's part. *United States v. County of Arling-*

*ton, Va.*, 702 F.2d 485, 488 (4th Cir.1983). *See also, Frolova v. U.S.S.R.*, 558 F.Supp. 358 (N.D.Ill.1983) (refusal to allow immigration is public, not commercial, activity).

A case that involved facts analogous to those before us is *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371 (5th Cir.1980), which was decided under § 1605, not § 1610. In *Arango*, the plaintiffs sued the wholly owned, national airline of the Dominican Republic after being expelled from a flight because that country's officials would not permit them entry. Although the Court dismissed the appeal because it was taken from a non-appealable order, it discussed (in dicta) whether the "commercial activity" exception of § 1605(a)(2) would allow plaintiffs to bring their tort action against the airline. The *Arango* court considered the airline's actions in rerouting plaintiffs noncommercial because it concluded that the airline acted merely as the agent of the Dominican government. *Id.* at 1379.

We agree with the *Arango* analysis. The *Arango* court found that alleged "kidnapping" by a foreign state is not "commercial activity" under the FSIA because a private person cannot lawfully engage in that activity. 567 F.Supp. at 1501. A private person cannot lawfully engage in murder any more than he can in kidnapping or criminal assault. Carriage of passengers and packages is an activity in which a private person could engage. But it is not for those activities that LAN's assets are being executed against. Rather, plaintiffs assert that LAN itself participated in the assassination and essentially accuse LAN of being a co-conspirator or joint tortfeasor.[3] In other words, LAN is accused of engaging in state-sponsored terrorism the purpose of which, irrelevant under the FSIA, was to assassinate an opponent of the Chilean government. Politically motivated assassinations are not traditionally the function of private individuals. They can scarcely be considered commercial ac-

---

**3.** In fact, the court below relied on LAN's "status" as such to make its finding of apparent abuse of corporate form.

tivity. Viewed in this light, LAN's participation, if any, in the assassination is not commercial activity that falls within the § 1610(a)(2) exception and its assets therefore are not stripped of immunity.

### III  Right Without a Remedy

The district court's principal concern with finding LAN immune from execution on its assets was that "[h]aving determined to grant jurisdiction in both commercial and tort claims, it appears out of joint to conclude that Congress intended the surprising result of allowing only commercial creditors to execute on their judgments," 567 F.Supp. at 1499–1500. Hence, it concluded that Congress would not create a right without a remedy. Few would take issue with the district judge's comment as an abstract principle of statutory interpretation. Nevertheless, when drafting the FSIA Congress took into account the international community's view of sovereign immunity. That makes a world of difference in the Act's interpretation. The Act's history and the contemporaneous passage of similar European legislation strongly support the conclusion that under the circumstances at issue in this case Congress did in fact create a right without a remedy. Congress wanted the execution provisions of the FSIA to "remedy, in part, the [pre-FSIA] predicament of a plaintiff who has obtained a judgment against a foreign state." House Report, supra, at 6605–06 (emphasis added). It is to that pre-FSIA plaintiff's predicament that we now turn.

To put the execution immunity provisions of the 1976 Act in proper perspective it is helpful to examine them in light of the European Convention on State Immunity and Additional Protocol adopted in 1972 and the United Kingdom's enactment of The State Immunity Act of 1978. Although these two codifications contain vastly different approaches to execution of judgments, they are relevant to this discussion in that neither Act ensures that a party may execute on a judgment against a foreign state by attaching property, even if it may validly assert jurisdiction over that foreign state. See Note, The International-

al Law Association Draft Convention on Foreign Sovereign Immunity: A Comporative Approach, 23 Va.J.Int'l L. 635, 658 (1983).

The European Convention, because of its members' conflicting views, decided not to provide machinery for the enforcement of judgments by execution. The Convention relied instead on the obligation of an individual State to honor judgments taken against it. A judgment creditor must ordinarily obtain satisfaction through executive or administrative channels, though when both States involved have made certain declarations the European Court of Human Rights provides a judicial remedy. ILA Draft Convention at 662–63. In effect, the European Convention leaves execution by judgment creditors at the mercy of the defendant State's policies. This is scarcely surprising as Article 2, paragraph 7 of the Charter of the United Nations declared the same rule 37 years earlier. Paragraph 7 prohibits the United Nations from intervening "in matters which are essentially within the domestic jurisdiction of any state." S. Goodrich & E. Hambro, Charter of the United Nations, Commentary and Documents 65 (1946).

The State Immunity Act like the FSIA grants general immunity from execution over a foreign state's property except that, unlike the FSIA, which permits execution only on property upon which the claim is based, courts in England may execute on property in use or intended to be used for commercial purposes. ILA Draft Convention at 661. Hence, The State Immunity Act restricts immunity from execution more than the FSIA and subjects any property of the foreign state used for commercial purposes to execution.

■ The FSIA distinguishes between execution against property of an agency or instrumentality of a foreign state, which may be executed against regardless of whether the property was used for the activity on which the claim is based under § 1610(b)(2), and the property of the foreign state itself, which may be executed against only when the property was used

for the commercial activity on which the claim is based under § 1610(a)(2). In so distinguishing, Congress sharply restricted immunity from execution against agencies and instrumentalities, but was more cautious when lifting immunity from execution against property owned by the State itself. Congress passed the FSIA on the background of the views of sovereignty expressed in the 1945 charter of the United Nations and the 1972 enactment of the European Convention, which left the availability of execution totally up to the debtor state, and its own understanding as the legislative history demonstrates, that prior to 1976 property of foreign states was absolutely immune from execution. *House Report* at 6606. It is plain then that Congress planned to and did lift execution immunity "in part." Yet, since it was not Congress' purpose to lift execution immunity wholly and completely, a right without a remedy does exist in the circumstances here. Our task must be to read the Act as it is expressed, and apply it according to its expressions. *See Berger v. United States*, 255 U.S. 22, 35, 41 S.Ct. 230, 233, 65 L.Ed. 481 (1921).

CONCLUSION

We hold therefore that the Foreign Sovereign Immunities Act does not allow execution against the assets of LAN, the Chilean National Airlines.[4] The court below improperly ignored defendant LAN's separate juridical status from the Republic of Chile. Ordinarily, we would remand for further evidentiary hearings on the separateness issue, but we are further persuaded, even were LAN and Chile found to be alter egos, that Congress did not provide for execution against a foreign state's property under the circumstances of this case. Congress provided for execution

against property used in commercial activity upon which the claim is based. An act of political terrorism is not the kind of commercial activity that Congress contemplated.

Accordingly, we reverse the orders appealed from and dismiss the supplementary proceedings.

---

**4.** Although tenuous, other remedies may still be possible. Chile itself may decide as an act of international good-will to honor the judgment of the United States District Court for the District of Columbia. Alternatively, the United States may be persuaded to bring this claim before some international tribunal as it did in *Z & F Assets Realization Corp. v. Hull*, 311 U.S. 470, 487, 61 S.Ct. 351, 354, 85 L.Ed. 288 (1941),

or there may be a forum in South America or elsewhere equivalent to the European Court of Human Rights that will provide a judicial remedy.