**767 THIRD AVENUE ASSOCIATES and Sage Realty Corporation, Plaintiffs,**

v.

**PERMANENT MISSION OF The REPUBLIC OF ZAIRE TO The UNITED NATIONS, Defendant.**

**No. 91 Civ. 4968 (LBS).**

United States District Court, S.D. New York.

March 24, 1992.

Shea & Gould (Robert J. Ward, Joseph Ferraro, Jean–Marie L. Atamian, Andrew B. Messite, of counsel), New York City, for plaintiffs.

Rubin & Shang (Jeffrey M. Rubin, David C.Y. Cheung, of counsel), New York City, for defendant.

U.S. Atty., S.D.N.Y., M. Chinta Gaston, Asst. U.S. Atty., New York City, for U.S.

SAND, District Judge.

This action calls into question the rights of a private landlord who has leased premises to a foreign mission to the United Nations which has concededly defaulted on its rental obligations for over a year and a half. The premises at issue are the entire twenty-fifth floor of a commercial office building. The action presents the important question, apparently of first impression, whether such a landlord may regain possession of the premises from its tenant or whether such action is forever barred by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 (1991) (the "FSIA"), or any treaty obligations.

By order of judgment dated January 15, 1992, we awarded plaintiffs damages and possession of their premises and directed the United States Marshal to remove the Permanent Mission in the event that it failed to vacate on or before January 31, 1992. By order dated January 31, 1992, upon defendant's request, we granted a stay of the order of eviction and ordered the parties to appear before us on February 3, 1992. After a lengthy hearing on that date, we directed the parties and the United States Government, which had since intervened on defendant's behalf, to brief more fully the issue of defendant's claim of diplomatic immunity from eviction. The parties have since done so, and we now consider the merits of defendant's and the Government's (hereinafter "Movants") application for a continued stay pending appeal.

## I. BACKGROUND

The backdrop to this action is a landlord-tenant dispute between plaintiffs 767 Third

Avenue Associates and Sage Realty Corporation (together "Plaintiffs") and defendant Permanent Mission of the Republic of Zaire to the United Nations (the "Mission"). Plaintiffs are, respectively, a partnership which owns the building at 767 Third Avenue in New York City and its managing agent. The Mission is the official delegation representing the Republic of Zaire at the United Nations.

On May 19, 1982, plaintiff Sage Realty entered into a ten year written lease with the Mission for the entire twenty-fifth floor of the building (the "Premises"). The Mission took possession of the Premises on or about May 22, 1982 and remains in possession to this date.

In October 1987, after the Mission had failed to pay its rent for more than seven months, Plaintiffs commenced an action against the Mission before this Court. By judgment dated August 22, 1989, we terminated the Mission's lease, awarded possession of the Premises to Plaintiffs, and awarded Plaintiffs damages in the amount of $244,157.49.

After entry of the above judgment, the Mission paid Plaintiffs the full amount of damages. With Plaintiffs' consent, the Mission remained in possession as a month-to-month tenant, without a written lease, paying use and occupancy charges in the fixed amount of $19,350 per month.

During the summer of 1990, the Mission again began to default on its rental obligations. By letter dated April 26, 1991, prompted by the Mission's failure to respond to repeated demands to cure its arrears, plaintiff Sage Realty notified the Mission that Plaintiffs had elected to terminate the month-to-month tenancy as of May 31, 1991. On July 22, 1991, Plaintiffs commenced this action against the Mission, seeking unpaid use and occupancy charges from August 1990, attorneys' fees, and possession of the Premises.

Plaintiffs thereafter moved for summary judgment and the Mission cross-moved to dismiss. The Mission did not contest its default on the rental payments, but rather claimed that it had been improperly served

under the FSIA and that Plaintiffs were precluded from seeking the remedy of eviction by the doctrine of sovereign immunity. The Court heard oral argument on both motions on November 7, 1991.

Following argument on that date, we issued an oral opinion granting Plaintiffs' motion for summary judgment and denying the Mission's cross-motion to dismiss. *See* Transcript of Oral Argument, November 7, 1991. In reaching our decision, we first found that "actual notice" of the suit had been given, thereby achieving the purposes of the FSIA with respect to service. *Id.* at 9–10. We also rejected the Mission's claim that it was immune from eviction, finding that the FSIA's prohibition against "execution and attachment" of property owned by a foreign sovereign did not preclude the eviction of a tenant wrongfully in possession of privately owned premises. *Id.* at 10–11.

On November 14, 1991, this Court signed an order and judgment awarding Plaintiffs damages and directing the Mission to vacate the Premises. Because that order did not specify a date by which the Mission was required to depart, however, Plaintiffs submitted a second order and judgment. On January 15, 1992, we signed the second order and judgment (hereinafter the "Judgment"), which: awarded Plaintiffs back-damages of $387,154.72 and $833.19 per day for continued use and occupancy; directed the Mission to vacate the Premises; and directed the United States Marshal to remove the Mission in the event that it failed to vacate on or before January 31, 1992.

On January 28, 1992, the Mission filed a Notice of Appeal to the Second Circuit. On January 30, 1992, the Mission sought a stay of the Judgment pending appeal and informed the Court that the United States Government planned to intervene on its behalf. By order dated January 31, 1992, we granted a stay of that part of the Judgment directing the Marshal to evict the Mission and ordered the parties to appear for a conference on February 3, 1992.

On February 3, 1992, following submission of the Government's Statement of Interest,[1] Plaintiffs, the Mission and the Government appeared before the Court. After extended argument during which the Government represented that eviction of the Mission would contravene United States treaty obligations and that diplomatic alternatives were being actively pursued,[2] we extended the stay and ordered further briefing on the issue of immunity from eviction. *See* Transcript of Oral Argument, February 3, 1992 (hereinafter "Trans."). The Government and Plaintiffs have since submitted further briefs and affidavits, and we now turn to the merits of the motion for a stay.

## II. DISCUSSION

In deciding whether to grant a stay pending appeal, this Court must consider four factors: (1) whether Movants have made a strong showing of the likelihood of success on the merits; (2) whether Movants will be irreparably injured absent the stay; (3) whether granting the stay would substantially harm the other parties in the proceeding; and (4) where the public interest lies. *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2118, 95 L.Ed.2d 724 (1987); *United States v. Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir.1991).

1. The Government intervened in this suit pursuant to 28 U.S.C. § 517 (1991), which authorizes the Attorney General to send any officer of the Department of Justice to attend to the interests of the United States in a pending suit.

2. For a detailed chronology of the State Department's diplomatic efforts to induce the Mission to pay this debt, *see* Declaration of John S. Wolf, Acting Assistant Secretary of State for International Organization Affairs, in Support of Government's Supplemental Statement of Interest (February 27, 1992) ¶ 10 (hereinafter "Wolf Dec."). Recently, the State Department has stepped up those diplomatic pressures. According to the Supplemental Declaration of Robert C. Moller, submitted to this Court on March 16, 1992, the State Department has warned Zaire that unless the debt to Plaintiffs is paid by April 18, 1992, two identified diplomats from the Zaire Mission will be expelled from the United States for "abuse of the privilege of residence" pursuant to § 13(b) of the Headquarters Agreement between the United States and the United

## A. LIKELIHOOD OF SUCCESS ON THE MERITS.

Of the four factors relevant to our decision to grant or deny a stay, the question of likelihood of success on the merits is the most hotly contested by the parties. Movants do not dispute the Mission's default on its rental obligations, but insist that the FSIA and other treaties relating to sovereign immunity preclude the remedy of eviction. Plaintiffs respond that those pronouncements do not apply to the situation at hand, and emphasize that if Movants' contentions were accepted, a private landlord could be forced to "host" its nonpaying diplomatic tenant *ad infinitum*, so that its property would in effect have been "taken."

### 1. *Immunity Under the FSIA.*

■ The first basis for Movants' claim of immunity from eviction is section 1609 of the FSIA, which states:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act, *the property in the United States of a foreign state shall be immune from attachment, arrest and execution.*

28 U.S.C. § 1609 (1991) (emphasis added). Sections 1610 and 1611 of the Act set forth certain exceptions to the general ban against execution or attachment, none of which are asserted by Plaintiff here.[3]

Nations. *See* Supplemental Declaration of Robert C. Moller, Counsel for Host Country Affairs for the United States Mission to the United Nations (March 16, 1992).

3. Because the Mission's lease contained certain boilerplate provisions regarding eviction, *see* Lease dated May 19, 1982, § 17.01(2)(2d) (attached as Exh. A to Plaintiffs' Notice of Motion for Summary Judgment), the parties have alluded to the potential applicability of § 1610(a)(1) of the Act. That section sets forth a "waiver" exception to the immunity conferred by § 1609, permitting execution or attachment of "property in the United States of a foreign state ... used for a commercial activity in the United States" where "the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication."

Plaintiffs do not directly claim that the waiver exception applies, and argue instead that the Mission's lease has terminated and that "no property owned by defendant" is involved at this point. *See* Memorandum of Law in Opposi-

Movants cite this section for the proposition that although Plaintiffs may rightfully seek and obtain a monetary judgment against them, they may not regain possession of the Premises.

We have reviewed the language of the FSIA and the legislative history underlying it. Neither suggests immediately that Congress considered the precise situation at issue: whether an eviction constitutes an "attachment" or "execution" falling within the statutory prohibition. We have also reviewed a number of cases construing the statute in other factual contexts, including *Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985).

In the *Letelier* case, the plaintiffs had obtained a tort judgment against the Republic of Chile and sought to satisfy it by executing against the property of the Chilean national airline, which was located in New York. The Second Circuit first addressed the question of whether the plaintiffs had demonstrated that the airline was a suitable alter ego of Chile for the purposes of satisfying the judgment, and found that they had not. Even assuming that the plaintiffs might later be able to meet that burden, however, the Court held that the FSIA did not permit execution against a foreign state's property under the circumstances of the case. Instead, the Court found that execution was permissible only if the property fell within one of the explicit exceptions to § 1609, and that that result was dictated by the FSIA even if it left a plaintiff completely without a remedy to enforce its judgment against a foreign state. *Id.* at 798–99.

After a careful review of the above-cited authorities, we find that the sovereign immunity conferred by the FSIA does not include immunity from eviction for non-payment of rent from privately owned premises. The statute by its very terms contemplates a situation in which a judgment creditor seeks to enforce its judgment against a sovereign by attaching or otherwise executing upon assets owned by the foreign state. Yet while that prohibition is crystal clear and efforts to evade it have understandably been rebuffed by other courts, *see, e.g., Letelier, supra*, the circumstances of this case are sharply distinguishable. Here, instead of seeking to enforce the Judgment of this Court by attaching or executing upon the Mission's assets, Plaintiffs are merely attempting to regain possession of property which is rightfully theirs.[4] That remedy is neither explicitly nor implicitly prohibited by the FSIA, and we decline Movants' invitation to expand the immunity conferred by that Act.

### 2. *Immunity Under United States Treaty Obligations.*

■ Movants next claim that the Mission cannot be evicted in light of various treaties and charters to which the United States is a signatory. Movants rely heavily on Article 22 of the Vienna Convention on Diplomatic Relations, which provides:

(1) The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, except with the consent of the head of the mission. (2) The receiving State is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity.

*See* Vienna Convention on Diplomatic Relations, April 18, 1961, art. 22(1) & 22(2), 23 U.S.T. 3227 (hereinafter the "Vienna Con-

---

tion to Defendant's Motion for a Stay Pending Appeal at 15. While we need not determine whether the section applies, therefore, we note that the exception apparently extends only to property "used for a commercial activity," and that Plaintiffs have made no showing that the Premises are used for anything other than diplomatic purposes.

**4.** Although in certain instances a foreign sovereign's leasehold interest may constitute "proper-

ty," in this situation, no such property interest is at stake. As Plaintiffs note in their brief opposing the stay: "At best, [the Mission] had a ten year leasehold interest in the Premises: that interest, and defendant's interest as a month-to-month tenant, have clearly and lawfully terminated. Now [the Mission] has bare and wrongful possession of the Premises and nothing else." *See* Memorandum of Law in Opposition to Defendant's Motion for a Stay Pending Appeal at 10.

vention"). Although it is not cited in any of Movants' briefs, article 22(3) provides further that "The premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment or execution." *Id.*, art. 22(3).

In addition to those sections of the Vienna Convention, Movants find support for their position in the United Nations Charter and the 1946 Convention of the Privileges and Immunities of the United Nations (hereinafter the "U.N. Convention"). Those agreements confer upon representatives to the United Nations "such privileges and immunities, as are necessary for the independent exercise of their functions in connection with the Organization," U.N. Charter, August 8, 1945, art. 105(2), 59 Stat. 1031, 1053, and "inviolability for all papers and documents," U.N. Convention, February 13, 1946, art. IV, § 11(b), 21 U.S.T. 1418. Finally, Movants cite a number of cases that refer to the United States' legal obligation under these treaties to protect the premises of foreign missions *See, e.g., Boos v. Barry,* 485 U.S. 312, 323, 108 S.Ct. 1157, 1165, 99 L.Ed.2d 333 (1988) (affirming the Nation's "need to protect diplomats"); *Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 474 (2d Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981) (citing the United States' "substantial interest in protecting foreign officials and their property" to uphold restrictions on demonstrations outside the Soviet Permanent Mission).

We have scrutinized the language of these treaties, the background to their adoption, and the cases cited in Movants' briefs. Our review convinces us that the notion of protection from eviction from privately owned leased premises was not specifically addressed by any of the treaties. We conclude, however, that the treaties' grants of "inviolability" and "privileges and immunities" were prompted by concerns other than those present in this case.

The language of the above treaties demonstrates that they were driven by two principal concerns: first, a perceived need to protect the sovereign from mob violence and other harassment; and second, a recognition that the premises of the sovereign are entitled to protection from unannounced seizures or other invasions of privacy. The first of these concerns is reflected in the Vienna Convention's articulation of a "special duty" to protect the premises of the mission from any "intrusion," "damage," "disturbance of the peace," or "impairment of its dignity," and in a number of cases rejecting first amendment challenges in light of the government's obligation to protect foreign diplomats and their property. *See, e.g., Concerned Jewish Youth, supra; International Soc'y for Krishna Consciousness, Inc. v. City of New York,* 501 F.Supp. 684 (S.D.N.Y.1980); *Greenberg v. Murphy,* 329 F.Supp. 37 (S.D.N.Y.1971). The second concern is reflected in the Vienna Convention's declaration of the "inviolability" of mission premises and immunity from search and seizure; in the U.N. Convention's assertion of "inviolability for all papers and documents"; and implicitly in the U.N. Charter's grant of privileges and immunities "necessary" for the independent exercise of United Nations functions.

This Court has had the benefit of extensive briefing by the parties and has heard oral argument on two occasions. Despite that substantial record, we remain unconvinced that permitting the eviction of the Mission would implicate either of the interests identified above. In the first place, we reject outright Movants' contention that the eviction would threaten the physical safety of Mission members. *See* Government's Supplemental Statement of Interest at 18 (noting that "should Zairian representatives ... resist peaceful attempts by the United States Marshal to enter the mission, physical compulsion would be required"). Not only is it highly speculative that such resistance would occur, but it is doubtful that the treaties were intended to protect diplomats from injuries sustained resisting a party's lawful efforts to recover its own property.

Nor is the second concern applicable in this context, since although eviction would require entry of the Premises by a United

States Marshal, such an entry would hardly be sudden or unexpected. Plaintiffs put the Mission on notice of their intent to evict them by letter dated April 26, 1991. Since that time, Plaintiffs not only commenced a court action but obtained a Judgment of eviction from this Court. Even the Government has informed the Mission over the course of pursuing "diplomatic alternatives" to eviction that the Mission could not expect to remain in the Premises indefinitely without paying rent. *See, e.g.,* Letter from Thomas R. Pickering, United States Representative to the United Nations, to Lukabu Khabouji N'Zaji, Zaire's Charge d'Affaires (February 11, 1992) (attached as Exh. A to Wolf Declaration) (warning that "Unlimited tenure in offices or residences without paying rent is unacceptable."). The Mission has not only had ample time to avoid a non-consensual entry by vacating voluntarily, therefore, but any entry at this point will have been preceded by so much notice that the privacy of Mission members or secrecy of Mission papers could not possibly be threatened.[5]

In sum, Movants have failed to demonstrate that either the FSIA or other treaties preclude Plaintiffs from evicting them from the Premises. Because they have proffered no other defense to the Court's Judgment of eviction, Movants have not met their burden of demonstrating a likelihood of success on the merits.

## B. IRREPARABLE INJURY.

■ Another factor that we must consider is whether Movants will suffer irreparable injury unless a stay is granted. Movants first argue that the Mission will suffer irreparable harm if evicted because it will "no longer be able to carry out its functions" or "meet its agenda at the United Nations." *See* Defendant's Letter Application for a Stay Pending Appeal (January 29, 1992) at 2. Movants also argue that our refusal to stay the eviction will inflict irreparable injury on the Government, both by "forcing" it to violate its international treaty obligations and by threatening the status of United States diplomatic personnel abroad.

Movants' first claim of irreparable harm is unconvincing. The Mission contends that eviction would interfere with its ability to function as a productive member of the United Nations. It has made no showing that the Premises at 767 Third Avenue are unique, however, or that it is restrained by anything other than its own financial condition from moving elsewhere. The Mission's failure to seek alternative housing arrangements during the pendency of this action undercuts the legitimacy of this claim of irreparable harm.

Movants' other claims of irreparable injury are more considerable. The Government alleges that our condonation of the eviction will force it to violate its international obligations, and expresses concern that our decision will compromise the protection afforded the United States mission in Zaire and other missions and personnel abroad. *See* Wolf Dec. ¶¶ 7-9.

Although the above discussion reflects our own view that the eviction does not contravene United States treaty obligations, we have no way of gauging whether the Government's predictions of international repercussions are realistic or overblown. Despite our willingness to acknowledge a national interest in blocking the eviction, however, we find unacceptable Movants' contention that the entire burden of these concerns should be borne by a single private landlord. The Government's obligation and ability to distribute that bur-

---

5. In an effort to bolster its contention that a mission cannot be entered for any purpose without consent, the Government describes how even in urgent situations such as a bomb scare, United States agents customarily refuse to enter a mission until they receive permission from its occupants. *See* Declaration of Robert C. Moller, Counsel for Host Country Affairs for the United States Mission to the United Nations, in Support of the Government's Supplemental Statement of Interest (Feb. 27, 1992), ¶¶ 3-6 (hereinafter "Moller Dec."). Those situations are distinguishable from the instant case, however, in that the sudden and unannounced entry by United States agents occasioned by a bomb scare could clearly compromise the confidentiality of mission affairs. In this case, by contrast, the Mission will have had more than ample time to ensure that its removal from the Premises is an orderly one.

den more broadly is discussed in greater detail in Part D, *infra.*

Having found Movants' allegations of irreparable harm inadequate to support an extension of the stay, we turn now to the remaining two factors of the four-part test.

## C. SUBSTANTIAL HARM TO PLAINTIFFS.

■ The third factor to consider in determining whether to grant Movants' application is whether the stay would "substantially harm" Plaintiffs. We find that this factor weighs heavily in Plaintiffs' favor.

Movants have argued throughout the litigation that a stay will not harm Plaintiffs because they have "already obtained the protection of a monetary judgment running in their favor for every day a stay is in place." *See* Government's Statement of Interest at 11. Movants refer to this Court's Judgment of January 15, 1992, which awarded damages for use and occupancy in the amount of $833.19 "for every day from November 1, 1991 until defendant vacates the premises."

Whatever the superficial logic of Movants' contention, it ultimately misses the point: this Court's Judgment is worthless unless Plaintiffs are guaranteed some means of recovering their rapidly escalating damages. Movants have represented that Zaire is in dire financial straits at the present time, *see* Wolf Dec. ¶ 4, and the Government specifically declined to insure collectibility in response to the Court's questions at oral argument. *See* Trans. at 5. In light of the uncertainty of recovering any damages under the Judgment, Plaintiffs' interest in "cutting their losses" by evicting the Mission and reletting the Premises is entirely understandable. Plaintiffs have therefore made a strong showing that they will suffer "substantial" harm in the event that a stay is granted.

## D. THE PUBLIC INTEREST.

■ The final factor that we must consider is whether a stay pending appeal would serve the public interest. Movants raise essentially the same arguments with respect to this factor as they did with re-

spect to their claim of irreparable injury—that the public interest is ill-served by forcing the Government to violate its obligations under international law and that we should exercise extreme care to prevent a landlord-tenant dispute from escalating into an "international incident." *See* Government's Statement of Interest at 11.

In response to Movants' contentions, we return to an issue raised earlier in addressing their allegations of irreparable injury: that no matter how important the Executive Branch's asserted foreign policy objectives may be, Plaintiffs should not be forced to assume sole responsibility for them. If the interests are as significant as the Government insists, they can surely be promoted more equitably—possibly by designating United States or United Nations funds to insure collectibility of the Judgment—than by thrusting their entire burden on the shoulders of a single private landlord. As Plaintiffs have argued and as we suggested repeatedly at oral argument, any other conclusion would raise a serious issue as to whether Plaintiffs had been subjected to an unconstitutional "taking" under the Fifth Amendment. *See* Memorandum of Law in Opposition to Defendant's Motion for a Stay at 8, 27; Trans. at 9–10, 19–20.

As a final matter, we note that it is far from obvious that the public interest and the interest of sovereigns themselves would be served by a finding that mission premises were immune from eviction. It is of course for the State Department, and not for this Court, to evaluate the chilling effect which would be placed on prospective landlords' willingness to rent to foreign sovereigns if the consequence of such a rental was the effective transfer of title insofar as legal remedies for non-payment of rent were concerned. Nevertheless, because Movants have argued that landlords have means of protecting themselves other than the eviction remedy, *see, e.g.,* Government's Supplemental Statement of Interest at 15 n. 4, we feel compelled to address them.

The Government first seeks to minimize the concern that landlords may be deterred from renting to foreign sovereigns by noting that some landlords attempt to avoid

Plaintiffs' plight by obtaining letters of credit guaranteeing payment of the rent. If such letters of credit extend only over the stated term of the lease, however, they would clearly afford insufficient protection against a diplomatic tenant who wrongfully remains in possession after the lease has expired. The cost of a letter of credit which sought meaningfully to protect the landlord would be considerable, and such cost would of course be borne by the tenant.

The Government next suggests that a landlord could protect itself by requiring a waiver of sovereign immunity in the lease itself. That proposal is also subject to significant limitations, however. In the first place, the waiver exception set forth in the FSIA appears to extend only to "property ... used for a commercial activity in the United States." FSIA § 1610(a); *see also* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 28, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6627 (stating that the "property in question must be used for a commercial activity in the United States" for the exceptions in paragraphs (1)–(5) of § 1610(a) of the FSIA to apply). The exception would therefore be of little help to a landlord renting to a mission, which by definition is used for diplomatic rather than commercial purposes.

Even were Plaintiffs able to invoke the waiver exception under the FSIA, however, that would not settle the issue. Since the immunity conferred by the FSIA is explicitly "[s]ubject to existing international agreements to which the United States [was] a party at the time" of the Act's passage, *see* FSIA § 1609, we would still have to consider whether waiver was prohibited by any of the other treaties or charters discussed above. Finally, even assuming that an explicit waiver were permissible under those other agreements, it still might not protect a landlord where, as here, the lease containing the waiver has terminated and it is unclear whether the waiver is still in effect.

In sum, it is far from clear that a stay of the Judgment is in the best interest of the public. Movants have therefore failed to demonstrate that this factor supports their contention that a stay should be granted.

## III. CONCLUSION

As our above review of the four factors suggests, Movants have failed to make a showing of likelihood of success on the merits, have made an inadequate showing of irreparable injury and promotion of the public interest, and have not overcome Plaintiffs' showing of substantial harm in the event a stay is granted. In an ordinary case, therefore, we would deny Movants' application for a stay in its entirety.

This is not an ordinary case, however, and as our discussion in Part A of the opinion reflects, our view of the merits has been influenced by the Mission's abundant notice of the eviction and corresponding ability to protect itself against any breach of security that it might engender. To lay to rest any lingering fears that a hasty eviction might threaten the confidentiality of Mission papers or the privacy of its members, however, we will deny Movants' request for a stay pending appeal but grant a more limited stay until April 20, 1992. That period will have the additional benefit of permitting any party to apply to the Second Circuit for a further stay. We deny any stay beyond April 20, 1992.

SO ORDERED.